UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| IN RE: HERBAL SUPPLEMENTS MARKETING AND SALES PRACTICES LITIGATION | MDL No. 2619<br>No. 15-CV-5070<br><br>Judge John W. Darrah<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

## REDACTED PUBLIC-RECORD VERSION

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ...................................................................1

II.   JURISDICTION AND VENUE .............................................................4

III.  THE PARTIES......................................................................................5

     A.    Plaintiffs ......................................................................................5

     B.    Defendants ...............................................................................10

IV.  FACTUAL ALLEGATIONS ...............................................................11

     A.    Herbal Supplements are Big Business ................................................11

     B.    The Dietary Supplement Industry Has Taken Advantage of the Lack of Regulatory Oversight to the Detriment of Consumers ...........................................13

     C.    Defendants Purport to Self-Police The Composition of Herbal Supplements, But Use Inconclusive Tests ...........................................................15

          1.    DNA testing is a reliable and accepted process to test the composition of herbal supplements. ..........................................................15

               a.    What is DNA?............................................................15

               b.    DNA in plants used in herbal supplements...................................17

               c.    What is DNA Barcoding?............................................................19

               d.    DNA testing is an accepted process to test herbal supplements...................................................................22

          2.    Testing used by the Defendants cannot determine whether the relevant botanical is actually present in the finished supplement, or in the amounts represented on the label...................................23

     D.    Target's Herbal Supplements........................................................28

          1.    Target represents that its up & up brand of products offers high quality at low prices. ...................................................................28

          2.    Target represents that the Affected Target Products are what they purport to be...........................................................................29

3.   Target sources its up & up dietary supplements from third parties but fails to verify that the products are what they are represented to be............................................................................30

4.   Testing establishes that the Affected Target Products do not contain the ingredients as represented on the labels. ...............................31

5.   Plaintiffs and the Target Classes would not have purchased the Affected Target Products had they known the truth. ...............................32

E.   Walgreen's Herbal Supplements.........................................................35

1.   Walgreens represents that its Finest Nutrition supplements will help consumers be "happy and healthy."...................................35

2.   Walgreens represents that the Affected Walgreens Products are what they purport to be. ............................................................36

3.   Walgreens sources its Finest Nutrition dietary supplements from third parties but fails to verify that the products are what they are represented to be. ...................................................................40

4.   Testing establishes that the Affected Walgreens Products do not contain the ingredients as represented on the labels. ...............................41

5.   Plaintiffs and the Walgreens Classes would not have purchased the Affected Walgreens Products had they known the truth.....................43

F.   Walmart's Herbal Supplements .........................................................45

1.   Walmart represents that its Spring Valley brand of products offers high quality at low prices..................................................45

2.   Walmart represents that the Affected Walmart Products are what they purport to be. ......................................................................46

3.   Walmart sources its Spring Valley dietary supplements from third parties but fails to verify that the products are what they are represented to be ...................................................................51

4.   Testing establishes that the Affected Walmart Products do not contain the ingredients as represented on the labels ...............................51

5.   Plaintiffs and the Walmart Classes would not have purchased the Affected Walmart Products had they known the truth...............................53

010494-12  828506 V1

G.     The Retailers' Suppliers, Including NBTY, are Also Responsible for the Misrepresentations, Omissions, and Mislabeling of the Affected Products ................................................................................................. 55

V.      CLASS ACTION ALLEGATIONS ............................................................. 56

VI.     TOLLING OF STATUTE OF LIMITATIONS ............................................ 60

VII.    CAUSES OF ACTION ................................................................................ 61

COUNT I  VIOLATION OF STATE CONSUMER PROTECTION LAWS (Target Class Against Target and NBTY) .................................................................. 61

COUNT II  VIOLATION OF STATE CONSUMER PROTECTION LAWS (Walgreens Class Against Walgreens and NBTY) ........................................... 65

COUNT III  VIOLATION OF STATE CONSUMER PROTECTION LAWS (Walmart Class Against Walmart and NBTY) ................................................. 70

COUNT IV  BREACH OF EXPRESS WARRANTIES (Target Class Against Target) ............. 74

COUNT V  BREACH OF EXPRESS WARRANTIES (Walgreens Class Against Walgreens) ............................................................................................. 78

COUNT VI  BREACH OF EXPRESS WARRANTIES (Walmart Class Against Walmart) .................................................................................................. 81

COUNT VII  BREACH OF IMPLIED WARRANTIES (Target Class Against Target) ............. 85

COUNT VIII  BREACH OF IMPLIED WARRANTIES (Target Class Against NBTY) ........... 88

COUNT IX  BREACH OF IMPLIED WARRANTIES (Walgreens Class Against Walgreens) ............................................................................................. 91

COUNT X  BREACH OF IMPLIED WARRANTIES (Walgreens Class Against NBTY) .................................................................................................... 94

COUNT XI  BREACH OF IMPLIED WARRANTIES (Walmart Class Against Walmart) .................................................................................................. 97

COUNT XII  BREACH OF IMPLIED WARRANTIES (Walmart Class Against NBTY) .................................................................................................... 100

COUNT XIII  UNJUST ENRICHMENT (Target Class Against Target and NBTY) ............... 103

COUNT XIV  UNJUST ENRICHMENT (Walgreens Class Against Walgreens and NBTY) .................................................................................................... 104

COUNT XV  UNJUST ENRICHMENT (Walmart Class Against Walmart and NBTY) ......... 105

010494-12  828506 V1

PRAYER FOR RELIEF ............................................................................................................106

DEMAND FOR JURY TRIAL ................................................................................................107

010494-12  828506 V1

Plaintiffs Linda Lee Boss, Victoria Shahrashian, John Burns, Louise L. Williams, Varonica Beal, Charles J. Haje, Donald J. Weeks, Justin Allsup, Jennifer Chamberlin, Melissa Harris, Karen Jones, Dale Kardasz, Elizabeth Anne Stokes, William Patrick Mobley, Joel Cohn, Nilsa Cintron, Russell Marks, Brenda Viera, Martin Angiulli, Kaitlyn Pirtle, and Carolyn Stevens, individually and on behalf of all those similarly situated, upon personal knowledge as to facts pertaining to Plaintiffs and upon information and belief as to all other matters, based on the investigation of their counsel, against Defendants Walgreen Boots Alliance, Inc. ("Walgreens"), Target Corporation ("Target"), Walmart Stores, Inc. ("Walmart"), NBTY, Inc., and John Does 1-100, state as follows:

## I.      NATURE OF THE ACTION

1.      A doula promoting the benefits of natural childbirth and using herbal supplements like Echinacea to treat flu and colds and Valerian  Root as a mild sedative, Plaintiff Kaitlyn Pirtle has been purchasing herbal supplements for her family and clients for years. Like the seven out of 10 Americans who have turned to the herbal supplement industry for natural and safe health benefits, Ms. Pirtle placed her trust – and health – in the hands of an industry claiming that its herbal supplements contained certain natural botanicals without contaminants.

2.      Little did she – or any of the Plaintiffs and Class members – know that the Defendants had no personal knowledge whether the botanicals they promoted for natural health benefits, such as St. John's Wort for depression or Garlic to reduce blood pressure, were actually present in their store-branded products. Instead, Plaintiffs and the Class relied on Defendants' representations that the store-branded herbal supplements contained the marketed botanical and relied on Defendants to ensure that the supplements did not contain undisclosed fillers and contaminants, or other botanicals not disclosed on the label.

3.      Notwithstanding their superior position of knowledge and experience, Defendants turned a blind eye to a supply and testing chain known in the industry as "*the Wild Wild West*,"[1] allowing third parties to manufacture, test and label their store-branded products without independent verification at each step in the supply chain. Why? Because the profit margin on supplements is nearly 10 times as high as that for food items.[2] Further, virtually no regulations govern the herbal supplements industry, leaving Defendants to self-police themselves.

4.      On February 2, 2015, the New York Attorney General sent Cease and Desist Letters to the Defendant Retailers, demanding they stop selling certain store brand herbal supplements that fail to contain the ingredients that the Defendants represent are contained in the herbal supplements, or, contain other substances that are not disclosed on the packaging for those herbal supplements.

5.      The New York Attorney General used DNA testing to test random samples from the Defendants' store-brand nutritional supplements (*i.e.*, Ginkgo Biloba, St. John's Wort, and Garlic).[3] While not used by any of the Defendants or their agents here, DNA barcoding is the only test that can *definitively* determine whether a particular plant species is actually present in a finished supplement. Using this DNA barcoding, the New York Attorney General found that the overwhelming majority of herbal supplements tested failed to contain *any* DNA of the primary ingredients they were represented to contain, and in many cases, contained ingredients not disclosed on the label.

---

[1] http://www.usatoday.com/story/opinion/2013/12/29/dietary-supplements-fda-regulation-editorials-debates/4243693/

[2] http://www.healthline.com/health-news/americans-spend-billions-on-vitamins-and-herbs-that-dont-work-031915

[3] Although the NYAG's samples were obtained exclusively from stores in New York, the Defendants' distribute herbal supplements, manufactured from the same lot, throughout the country.

- 2 -

6.     For example, the New York Attorney General informed Target that its store-branded St. John's Wort, Gingko Biloba, and Valerian Root did not contain *any* DNA of the botanical ingredients represented on their labels. The tests further revealed the presence of adulterants and undisclosed substances that were not listed on the labels, and concluded that the products "were either unrecognizable or a substance other than what they claimed to be, and therefore fairly constitute contaminated or substituted products."

7.     Similarly, the New York Attorney General demanded that Walgreens "cease and desist engaging in the sale of adulterated and/or mislabeled herbal dietary supplements, and in particular to immediately stop the sale of five 'Finest Nutrition' dietary supplements," including the store-branded Gingko Biloba, St. John's Wort, Ginseng, Garlic, and Echinacea. None of the five products contained the represented botanical and instead contained undisclosed contaminants, including, *inter alia,* undisclosed oryza (commonly known as rice), and wheat, despite the fact that the labels claimed that the products did not contain wheat.

8.     Likewise, the New York Attorney General informed Walmart that just 4% of Walmart's store-branded Spring Valley Gingko Biloba, St. John's Wort, Ginseng, Garlic, Echinacea, and Saw Palmetto that were sampled, contained DNA that actually matched the contents of the product label, 40% of the samples contained plant material other than what was listed on the product label, and 56% of the samples taken from Walmart supplements contained no plant DNA at all.

9.     Believing that they were promoting a healthier lifestyle by using natural botanical ingredients, Plaintiffs were duped into purchasing current-day snake oil. Regardless of which supplements they purchased, Plaintiffs and the Class paid for products that did not contain the botanical Defendants claimed the products to be.

- 3 -

10.     Defendants' conduct violates a number of state consumer protection and warranty laws, and led to Defendants being unjustly enriched at the expense of Plaintiffs and members of the Classes. Plaintiffs bring this proposed class action to enjoin Defendants from continuing to sell falsely labeled supplements, and seek compensatory damages and restitution for themselves and the other members of the proposed classes.

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, the proposed Class consists of 100 or more members, and minimal diversity exists.

12.     This Court has personal jurisdiction over the Defendants because they are authorized to do business and in fact do business in this district and have sufficient minimum contacts with this district, and/or each Defendant otherwise intentionally avails itself of the markets in this state through the manufacture, supply distribution, promotion, marketing and/or sale of its herbal supplements in this district, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Illinois because one of the Defendants, Walgreens, is located in this District, and a substantial part of the events underlying Plaintiffs' claims occurred in this District.

14.     Venue is also proper in this District pursuant to the June 9, 2015 Order of the Judicial Panel on Multidistrict Litigation, transferring all related cases to this Court for coordinated or consolidated pretrial proceedings.

- 4 -

## III.    THE PARTIES

**A.    Plaintiffs**

15.    Plaintiff Justin Allsup is an individual residing in Fairview Heights, Illinois. Plaintiff purchased approximately two bottles of "Finest Nutrition" St. John's Wort in 2014 and another bottle in early 2015 from Walgreens; four to five bottles of "Finest Nutrition" Saw Palmetto in 2013 from Walgreens; and two bottles of "up & up" Valerian Root in 2014 from Target. Plaintiff purchased these products at the Walgreens store located at 6505 N. Illinois Street, Fairview Heights, Illinois and the Target store located at 3400 Green Mount Crossing Dr., O'Fallon, Illinois.

16.    Plaintiff Martin Angiulli is an individual residing in Cincinnati, Ohio.  Mr. Angiulli also maintains a residence in Pennsylvania.  Since at least 2009, Plaintiff has purchased "Spring Valley" Gingko Biloba, St. John's Wort, Ginseng, Echinacea, Garlic, and Saw Palmetto from multiple Walmart locations, including the store located at 4000 Red Bank Road, Cincinnati, Ohio and the store located in Kittanning, Pennsylvania; "Finest Nutrition" Gingko Biloba, St. John's Wort, Echinacea, Garlic, Ginseng, and Saw Palmetto from the Walgreens store located at 1 West Corry Street, Cincinnati, Ohio; and "up & up" Gingko Biloba, Garlic, Echinacea, Saw Palmetto, St. John's Wort, and Valerian Root from the Target store located at 4825A Marburg Avenue, Cincinnati, Ohio.  Plaintiff estimates that he purchased a bottle of Gingko Biloba, St. John's Wort, Ginseng, Garlic, Valerian Root and Saw Palmetto approximately every 2-3 months since at least 2011.  With regard to Echinacea, Plaintiff estimates that he purchased at least four bottles since at least 2011.

17.    Plaintiff Varonica Beal is an individual residing in Pembroke Pines, Florida. Between 2011 and 2012, Plaintiff purchased "Finest Nutrition" Echinacea and Ginkgo Biloba

- 5 -

from Walgreens. Plaintiff purchased these products at the Walgreens store located at 3705 Hollywood Boulevard, Hollywood, Florida.

18.    Plaintiff Linda Boss is an individual residing in Manteca, California. Plaintiff has taken St. John's Wort for years. For the past few years, Plaintiff regularly purchased "up & up" St. John's Wort from Target. Plaintiff primarily purchased "up & up" St. John's Wort from the Target store located at 280 Spreckels Ave., Manteca, California.

19.    Plaintiff John Burns is an individual residing in Kissimmee, Florida. Approximately 18 to 24 months ago, Plaintiff purchased a twin pack of "Spring Valley" Garlic from the Walmart store located at 4444 West Vine Street, Kissimmee, Florida.

20.    Plaintiff Jennifer Chamberlain is an individual residing in West St. Paul, Minnesota. Plaintiff purchased approximately two bottles of "up & up" St. John's Wort in 2014 from Target. Plaintiff purchased these products at the Target store located at 1750 S. Robert Street, West St. Paul, Minnesota.

21.    Plaintiff Nilsa Cintron is an individual residing in Dumont, New Jersey. Plaintiff purchased "Finest Nutrition" Ginseng approximately two times during the Class Period from the Walgreens store located in Bergenfield, New Jersey.

22.    Plaintiff Joel Cohn is an individual residing in Union, New Jersey. Plaintiff purchased "up & up" Gingko Biloba approximately three times over the course of four years from the Target store located in Union, New Jersey.

23.    Plaintiff Charles J. Haje is an individual residing in Miramar Beach, Florida. Plaintiff purchased "Spring Valley" Ginkgo Biloba approximately 50 times and "Spring Valley" Ginseng approximately 25 times from Walmart. Plaintiff purchased these products primarily at the Walmart store located at 15017 Emerald Coast Parkway, Destin, Florida.

24.     Plaintiff Melissa Harris is an individual residing in St. Paul, Minnesota. Plaintiff purchased a bottle of "Spring Valley" Garlic and approximately four or more bottles of "Finest Nutrition" Garlic during the Class Period. Plaintiff purchased these products at the Walmart store located at 1450 University Avenue, St. Paul, Minnesota and the Walgreens store located at 425 Wabasha Street North, St. Paul, Minnesota.

25.     Plaintiff Karen Jones is an individual residing in Okolona, Mississippi. Plaintiff purchased "Spring Valley" Gingko Biloba approximately once every two months until 2013, "Spring Valley" St. John's Wort approximately once per month until approximately early 2015, "Spring Valley" Ginseng approximately once per month until early 2014, and "Spring Valley" Saw Palmetto approximately three times per year until 2013 from Walmart. Plaintiff also purchased "Finest Nutrition" Gingko Biloba, St. John's Wort, and Ginseng approximately two to three times each in the last four years from Walgreens. Plaintiff purchased these products at the Walmart store located at 2270 West Main Street, Tupelo Mississippi, and the Walgreens store located at 902 South Gloster Street, Tupelo, Mississippi.

26.     Plaintiff Dale Kardasz is an individual residing in Kirkwood, Missouri. In September 2013, Plaintiff purchased a bottle of "Spring Valley" Echinacea at the Walmart store located at 1202 S. Kirkwood Road, Kirkwood, Missouri.

27.     Plaintiff Russell Marks is an individual residing in New York, New York. Plaintiff purchased "Finest Nutrition" Echinacea and Garlic during the Class Period from the Duane Reade store located at 1279 Third Avenue, New York, New York.

28.     Plaintiff William Patrick Mobley is an individual residing in St. Louis, Missouri. In 2013, Plaintiff purchased a bottle of "Finest Nutrition" Ginseng at the Walgreens store located at 4218 Lindell Blvd., St. Louis, Missouri.

29.     Plaintiff Kristin Pirtle is an individual residing in Ames, Iowa. Plaintiff purchased "up & up" Echinacea, Ginkgo Biloba, Garlic, and Valerian Root approximately 10 times each during the Class Period from the Target stores located at 320 S. Duff Ave., Ames Iowa and 1800 Valley West Dr., West Des Moines, Iowa. Ms. Pirtle also purchased "Spring Valley" Echinacea approximately four or five times during the Class Period from the Wal-Mart store located at 3015 Grand Ave., Ames, Iowa.

30.     Plaintiff Victoria Shahrashian is an individual residing in Pasadena, California. Plaintiff purchased "Spring Valley" Echinacea from Walmart several times during the Class Period. In or about November 2014, Plaintiff purchased a 100-capsule bottle labeled "Spring Valley Echinacea" from a Walmart store located at 1600 Mountain Avenue, Duarte, California.

31.     Plaintiff Carolyn Stevens is an individual residing in Portland, Oregon. In 2014, Plaintiff purchased "Spring Valley" Gingko Biloba, St. John's Wort, Ginseng, Echinacea, and Saw Palmetto from the Walmart store located at 17275 NW Cornell Rd., Beaverton, Oregon. Plaintiff has also purchased "Finest Nutrition" Saw Palmetto several times in the last four years from the Walgreens store located at 7010 NE Cornell Rd., Hillsboro, Oregon.

32.     Plaintiff Elizabeth Anne Stokes is an individual residing in Jefferson City, Missouri. Plaintiff purchased bottles of "Spring Valley" Gingko Biloba, St. John's Wort and Echinacea at the Walmart store located at 724 W. Stadium Blvd., Jefferson City, Missouri.

33.     Plaintiff Brenda Viera is an individual currently residing in Elyria, Ohio. Plaintiff has regularly purchased "Spring Valley" Gingko Biloba, St. John's Wort, Echinacea, and Garlic from Walmart Stores located in Ocoee and Orlando, Florida (when she was a resident of Florida from 2008 to 2011), and Mays Landing, New Jersey (when she was a resident of New Jersey from 2011 to 2015).

- 8 -

34. Plaintiff Donald J. Weeks is an individual residing in Edwardsville, Illinois. Plaintiff purchased approximately three total bottles of "Finest Nutrition" Ginkgo Biloba and approximately four to five bottles per year of "Finest Nutrition" Saw Palmetto from Walgreens during the Class Period. Plaintiff purchased these products at the Walgreens store located at 102 W. Vandalia Street, Edwardsville, Illinois.

35. Plaintiff Louise Williams is an individual residing in Sunrise, Florida. Approximately two to three times a year during the Class Period, Plaintiff purchased "Spring Valley" Ginkgo Biloba, St. John's Wort, Ginseng, and Echinacea from Walmart. Plaintiff purchased these products from a variety of Walmart stores in the area surrounding Sunrise, Florida.

36. The herbal supplement products that Plaintiffs purchased were packaged with representations stating that the products contained the listed herbal supplements and no other ingredients, such as contaminants or fillers. Plaintiffs were exposed to Defendants' representations by reading the product labeling. Plaintiffs purchased and used the products in reliance on the Defendants' representations. If Plaintiffs had known that the products did not contain the listed herbal supplement or that the product contained additional undisclosed ingredients, such as contaminants and/or fillers, they would not have purchased the products.

37. As a result of Defendants' actions, Plaintiffs did not receive the benefit of the bargain, suffered out-of-pocket losses and are entitled to restitution. Plaintiffs have suffered injury-in-fact, damages and ascertainable losses of money or property by paying the purchase price for the Defendants' products, for which they are entitled to seek monetary damages.

38. One or more Plaintiffs, including Ms. Pirtle, provided the pre-litigation notice and/or notice before bringing a damages claim required by various state consumer fraud and

- 9 -

warranty statutes with respect to the Retailer Defendants. Nonetheless, notice is and was futile, as Defendants continue to deny the allegations of the lawsuits in this MDL and have not provided restitution despite the pendency of this MDL.

**B.      Defendants**

39.      Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation with its principal place of business at 108 Wilmott Road, Deerfield, Illinois. Walgreens owns and operates approximately 8,300 stores throughout the United States.[4] Defendant Walgreens manufactures and sells its own line of herbal supplements under the brand name "Finest Nutrition." Defendant Walgreens has been and still is engaged in the business of manufacturing and selling herbal supplements in the United States.

40.      Defendant Target Corporation is a Minnesota corporation with its principal place of business at 1000 Nicollet Mall, Minneapolis, Minnesota. As of February 2014, Target owned and operated approximately 1,800 retail stores throughout the United States.[5] Defendant Target manufactures and sells its own line of herbal supplements under the brand name "up & up." Defendant Target has been and still is engaged in the business of manufacturing and selling herbal supplements in the United States.

41.      Defendant Walmart Stores, Inc. is a Delaware corporation with its principal place of business at 702 S.W. 8th Street, Bentonville, Arkansas. Defendant Walmart manufactures and sells its own line of herbal supplements under the brand name "Spring Valley." Defendant Walmart has been and still is engaged in the business of manufacturing and selling herbal supplements in the United States.

---

[4] Walgreens Co. Form 10-K for the period ending August 31, 2014, at p. 24.

[5] Target Corporation Form 10-K for the period ending February 1, 2014, at p. 11.

42.     Defendant NBTY, Inc. is a Delaware corporation with its principal place of business in Ronkonkoma, Delaware. NBTY is one of the largest retailers, manufacturers, and distributors of vitamins, nutritional supplements, and related products in the United States, with operations throughout the world.[6] It has a "significant presence in virtually every major vitamin, mineral, herb and supplement product category and in multiple key distribution channels."[7] NBTY's facilities include administration, manufacturing, warehousing, packaging, and distribution facilities located in Florida, Illinois, New Jersey, New York, Pennsylvania, and Texas. It also manufacturers internationally in Winnipeg, Manitoba, Canada; Burton, United Kingdom; and Zhongshan, China. NBTY operates retail locations throughout the United States and Europe.[8]

43.     On information and belief, Defendants John Does 1-100 are either residents of or doing business in this judicial district, are transacting business at premises in this judicial district, and are subject to the jurisdiction of this Court. Defendants, alone or through their agents, servants or employees, are purchasing, contracting, procuring, manufacturing, providing, distributing, selling, offering for sale and/or testing herbal supplements for sale to Plaintiffs and the Classes by the defendant retailers.

## IV.     FACTUAL ALLEGATIONS

### A.     Herbal Supplements are Big Business

44.     Just walk into a grocery store and it becomes quickly apparent that dietary supplements are big business. Commanding a significant chunk of floor space, vitamins and

---

[6] *See* NBTY, Inc. Annual Report on the Form 10-K for the Fiscal Year Ended September 30, 2014.

[7] *See* http://www.nbty.com/OurBrands/VitaminsSupplements, (last viewed October 9, 2015).

[8] *See* NBTY, Inc. Annual Report on the Form 10-K for the Fiscal Year Ended September 30, 2014.

- 11 -

herbal supplements make up five percent of all grocery sales in the United States.[9] Their profit margins are about 10 times as high as those of food items,[10] incentivizing manufacturers to continuously expand their offerings.

45.     In fact, the vitamin and supplement industry has been growing about as fast as the Chinese economy, expanding 40 percent since 2008.[11]

46.     About 150 million adults nationally, or 7 out of every 10 adults, ingest dietary supplements, according to the Council for Responsible Nutrition, a trade group that represents supplement manufacturers.[12] Americans will spend at least $21 billion on vitamins and herbal supplements in 2015[13] (some say it is as high as $35 billion[14]) – 9 cents for every adult in the nation.[15] Including protein powders, supplements are as big a market as all organic foods combined.[16]

---

[9] http://www.healthline.com/health-news/americans-spend-billions-on-vitamins-and-herbs-that-dont-work-031915

[10] *Id.*

[11] *Id.*

[12] http://www.westhartfordnews.com/articles/2015/09/25/news/doc56033e193d8c3358522906.txt?viewmode=fullstory

[13] http://www.healthline.com/health-news/americans-spend-billions-on-vitamins-and-herbs-that-dont-work-031915

[14] http://www.westhartfordnews.com/articles/2015/09/25/news/doc56033e193d8c3358522906.txt?viewmode=fullstory

[15] http://www.healthline.com/health-news/americans-spend-billions-on-vitamins-and-herbs-that-dont-work-031915

[16] *Id.*

- 12 -

**B.    The Dietary Supplement Industry Has Taken Advantage of the Lack of Regulatory Oversight to the Detriment of Consumers**

47.    Put the search terms "Wild West Supplements Industry" in Google and more than 225,000 results pop up. "If the dietary supplement industry – which makes products ranging from multivitamins to fish oil and protein supplements – were a movie, it would have to be *Wild Wild West*," led one USA Today article.[17]

48.    Dietary supplements fall under the umbrella of food, not drugs.[18] Therefore, dietary supplements are not subject to the strict United States Food and Drug Administration (FDA) regulations that apply to drugs. While supplement manufacturers are subject to certain provisions of the Dietary Supplement Health and Education Act of 1994 ("DSHEA"), dietary supplement firms are not required to prove to the FDA that their products work or are safe before they sell them.[19] Rather, manufacturers of a "product … intended to supplement the diet that bears or contains … an herb or other botanical,"[20] are generally left to self-police their compliance with DSHEA, including the following.

49.    21 U.S.C. § 343(s) provides that a food "shall be deemed to be misbranded" if it is a dietary supplement and fails to list "the name of each ingredient" in the dietary supplement, the "quantity of each such ingredient," or "the label or labeling of the supplement fails to identify any part of the plant from which the ingredient is derived," or, if the supplement is either covered by the specifications of an official compendium, is represented as conforming to the

---

[17] http://www.usatoday.com/story/opinion/2013/12/29/dietary-supplements-fda-regulation-editorials-debates/4243693/

[18] 21 U.S.C. § 321(ff)(1)(C). For purposes of the Federal Food, Drug, and Cosmetic Act, "a dietary supplement shall be deemed to be a food…." *Id*. § 321(ff).

[19] http://articles.chicagotribune.com/2012-06-30/news/ct-met-supplement-inspections-20120630_1_dietary-supplements-inspections-american-herbal-products-association/2

[20] 21 U.S.C. § 321(ff)(1)(C). For purposes of the Federal Food, Drug, and Cosmetic Act, "a dietary supplement shall be deemed to be a food…." *Id*. § 321(ff).

- 13 -

specifications of an official compendium, and fails to so conform, or, for supplements that aren't covered by an official compendium, if it "fails to have the identity and strength that the supplement is represented to have."

50. 21 U.S.C. § 342(g)(1) provides that a food shall be deemed to be adulterated "[i]f it is a dietary supplement and it has been prepared [or] packed … under conditions that do not meet current good manufacturing practice regulations…."

51. Current implementing regulations promulgated by the FDA under DSHEA[21] require dietary supplement manufacturers, packagers, and labelers ("Manufacturer")[22] to "implement a system of production and process controls that covers all stages of manufacturing, packaging, labeling, and holding of the dietary supplement to ensure the quality of the dietary supplement…."[23]

52. Manufacturers must establish "component specifications … to ensure … the purity, strength and composition of dietary supplements manufactured using the components…."[24]

53. Manufacturers are required to test each component used in the manufacture of dietary supplements, including on each incoming shipment of components prior to their use in the manufacture of dietary supplements,[25] and again on each finished batch.[26]

---

[21] *See* Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements, 72 Fed. Reg. 34752 (June 25, 2007).

[22] 21 C.F.R. § 111.3.

[23] *Id.* § 111.55; *see also id.* § 111.65 (requiring manufacturers to implement quality control systems).

[24] *Id.* § 111.70(b)(2).

[25] *Id.* § 111.75(a).

[26] *Id.* § 111.75(c).

54.     While the FDA only spot tests about one percent of the 65,000 dietary supplements on the market for safety,[27] the limited testing conducted by the FDA demonstrates systemic failure. "Every week for the past 7½ years, the U.S. Food and Drug Administration has identified an average of two dietary supplements being sold to consumers that were 'tainted' and 'potentially hazardous….'" [28]

55.     FDA data reveals that firms regularly manufacture and distribute herbal products that contain contaminants or fillers. For example, 615 dietary supplements were identified as tainted between 2008 and 2015.  In the first half of 2015 alone, 59 tainted dietary supplements were posted on the FDA's site.[29] Just the tip of the iceberg, "[t]he FDA says the tainted supplements in its database are a small fraction of the potentially hazardous products with hidden ingredients marketed to consumers on the Internet and in retail establishments."[30]

**C.     Defendants Purport to Self-Police The Composition of Herbal Supplements, But Use Inconclusive Tests**

**1.     DNA testing is a reliable and accepted process to test the composition of herbal supplements.**

**a.     What is DNA?**

56.     Deoxyribonucleic acid or DNA is the chemical name for the molecule found in all living things that carries an organism's genetic instructions, including the genetic instructions for the botanicals at issue in this case. These instructions are passed from an organism to its offspring in the reproduction process.

---

[27] http://www.healthline.com/health-news/americans-spend-billions-on-vitamins-and-herbs-that-dont-work-031915#5.

[28] http://www.westhartfordnews.com/articles/2015/09/25/news/doc56033e193d8c3358522906.txt.

[29] *Id.*

[30] *Id.*

- 15 -

57.     A DNA molecule consists of two strands that wind around one another to form a shape known as a double helix. Each strand has a backbone made of alternating sugar (deoxyribose) and phosphate groups. Attached to each sugar is one of four bases – adenine (A), cytosine (C), guanine (G), and thymine (T). The two strands are held together by bonds between the bases; adenine (A) bonds with thymine (T), and cytosine (C) bonds with guanine (G).[31] The following depicts the DNA double helix, and its composition:



**DNA's Double Helix.** DNA molecules are found inside the cell's nucleus, tightly packed into chromosomes. Scientists use the term "double helix" to describe DNA's winding, two-stranded chemical structure. Alternating sugar and phosphate groups form the helix's two parallel strands, which run in opposite directions. Nitrogen bases on the two strands chemically pair together to form the interior, or the backbone of the helix. The base adenine (A) always pairs with thymine (T), while guanine (G) always pairs with cytosine (C).

---

[31] http://www.genome.gov/Glossary/index.cfm?id=48.

58.     As can also be seen in the above figure, an organism's DNA is generally found inside a cell's nucleus. The DNA is then packaged tightly into a cell's chromosomes, also inside an organism's cells. The entirety of the DNA in an organism is called the genome. The genome (or complete set of DNA) in a human generally consists of 3 billion bases, consisting of 20,000 genes, on 23 pairs of chromosomes.[32]

59.     In a typical DNA molecule, each pairing of adenine and thymine, and each pairing of guanine and cytosine, form what is referred to as a base pair. The order, or sequence, of these base pairs determines what biological instructions are contained in a strand of DNA. For example, the sequence ATCGTT might instruct for blue eyes, while ATCGCT might instruct for brown.[33] A healthy DNA molecule generally consists of many base pairs.

### b.      DNA in plants used in herbal supplements

60.     In plant taxonomic hierarchy, a species is the most specific taxonomic designation. A species belongs to a broader taxonomic designation named genus, which may comprise several (or numerous) closely related plant species. For example, with respect to the plant Echinacea purpurea, purpurea is the species and Echinacea is the genus. The following graphic depicts this taxonomic hierarchy:

---

[32] https://www.genome.gov/25520880.

[33] *Id.*

- 17 -



61.     All herbal supplements purportedly contain portions of at least one plant species. Because like humans, plants are also living organisms, they possess DNA that is unique to each plant species. Therefore, a plant's DNA is reliable evidence used to identify the specific plant at issue.

62.     Although some herbal supplements may actually contain physical pieces of a particular plant, many herbal supplements do not. For those that do not, they generally will contain processed portions of the plant, commonly referred to as an extract. Although a plant goes through processing in order to produce an extract, the DNA from the plant also travels through the production process into the finished herbal supplement, although the DNA does degrade to some extent.

63.     For example, in the context of the manufacture of herbal supplements, a botanical is often cultivated, and then dried. DNA contained in a dried plant is generally very stable, and will generally remain completely (or almost) completely intact. In fact, in dried form, DNA can remain in the plant for hundreds or even thousands of years.

- 18 -

64.     Once dried, the plant would likely be placed into a solution in order to extract the various compounds, or certain compounds, contained in the plant, which the manufacturer believes produces the desired effect. In this process, certain types of alcohols are most often used to perform the extraction, such as methanol or ethanol. In addition to alcohols, other material such as hexane, glycerol or liquid carbon dioxide may be used. Typically, alcohol based solutions (methanol or ethanol) are used, since these solutions are both efficacious and cost-effective.

65.     In the extraction process, no attempt is made to filter out DNA from the solution, and thus, DNA is carried from the plant into the extract. DNA is not specifically filtered out because the presence of DNA does not affect the extract one way or the other, and therefore, no reason exists to undertake additional time and expense to filter out the DNA from the extract.

66.     Whole DNA molecules are generally made up of millions base pairs (the pairing of adenine and thymine; cytosine and guanine). Even if the DNA molecule is fragmented in the extraction process, the DNA can be detectable because a fragment as small as 200 base pairs may be enough DNA to allow for the identification of the plant species from which the DNA came. Indeed, the New York Attorney General had found DNA in most of the finished herbal supplements tested – all of which were extracts – but not the DNA of plants listed on the label.

### c.     What is DNA Barcoding?

67.     Traditionally, plants were identified using their morphology or physical features, such as their size, color and/or shape of leaves, fruits or flowers, and other characteristics. However, this was an imperfect method of identification. For example, the leaves of one plant may be almost identical to the leaves of a distinct plant, but that comes from the same family of plants.

- 19 -

68.     Since every living organism possesses DNA, including the plants at issue in this case, scientists began to look into the use of DNA testing to determine the identification of a plant. In or around 2003, scientists from the University of Guelph published a paper describing the identification of plants through the use of DNA barcodes.[34] These scientists proposed using a certain short and standardized section of a DNA molecule to identify a plant species.[35] In plants, the gene regions typically used to identify a plant are the matK or rbcl gene regions.[36] The specific sequencing of the base pairs in these gene regions is unique to each plant species, and the sequence of A, G, C, and T, which is also unique to each plant species, is converted into a barcode. The barcodes for each plant species are then stored in a central database. The two most common databases used are the Barcode of Life Database, which is maintained by and located at the University of Guelph, and the International Nucleotide Sequence Database.[37]

69.     The following is a depiction of the base pairs found in the matK region of various plants, and the unique sequencing of adenine (A), guanine (G), cytosine (C) and thymine (T) of each:

---

[34] http://ibol.org/about-us/what-is-dna-barcoding/.

[35] *Id.*

[36] *Id.*

[37] http://www.barcodeoflife.org/content/about/what-dna-barcoding.



70.     As can be seen, the sequence of the base pairs in the sample titled "herbal supplement A" is identical to the base pairs found in racemosa, and therefore, the sample is identified as racemosa, commonly known as black cohosh. No other species possesses the same sequencing of A, C, T, and G, and therefore, one can be certain the sample is black cohosh.

71.     Sometimes, because of the degradation of DNA that may occur as a result of processing, the amount of DNA available in a finished herbal supplement will be minimal. However, reliable and reproducible techniques exist to amplify the DNA that does exist in a given sample.  One such technique is called polymerase chain reaction or PCR. PCR essentially takes a small fragment of DNA, and through a chain reaction process, produces copies of the DNA fragments, allowing for the identification of a species when only a small fragment of DNA exists.

- 21 -

**d. DNA testing is an accepted process to test herbal supplements**

72. DNA testing has been used as a forensic tool since at least the mid 1980's and is generally accepted as a reliable methodology.[38]

73. DNA barcoding, along with PCR amplification, has been used by respected scientists to conduct DNA testing on finished herbal supplements. For example, numerous peer reviewed journal articles exist which document successful DNA tests on finished herbal supplements.[39] It has also been used by the USDA to identify different species of Echinacea.[40]

74. In 2013, researchers at the Centre for Biodiversity Genomics at the University of Guelph published a study in which they used DNA barcoding to conclude that "[w]hat is listed on the label of herbal products is not always what is found within the product."

75. The Guelph researchers tested the authenticity of 44 finished herbal products from 12 companies and 30 different species of herbs.

76. Using DNA barcoding, the Guelph researchers concluded that the majority (52%) of herbal products tested did not contain the ingredients they purported to contain. Most (59%) of the herbal products tested contained species of plants that were not listed on the product labels. Some (33%) of the herbal products tested also contained contaminants and/or fillers that were not listed on the product labels.

---

[38] http://content.time.com/time/nation/article/0,8599,1905706,00.html.

[39] *See, e.g.*, *DNA barcodes for everyday life: Routine authentication of Natural Health Products*, Lauren J. Wallace, *et al.*, Food Research Int'l 49, at pp. 446-452 (2012); *DNA barcoding detects contamination and substitution in North American herbal products*, Steven G. Newmaster, *et al.*, BMC Medicine 2013, 11:222 (2013); *Authentication of Ginkgo biloba herbal dietary supplements using DNA barcoding*, Damon P. Little, NRC Research Press, Genome 57: 513-516 (2014); *DNA Barcode Authentication of Saw Palmetto Herbal Dietary Supplements*, Damon P. Little, *et al.*, Scientific Reports, 3:3518 (2013). *See also* http://www.ars.usda.gov/research/projects/projects.htm?accn_no=423521

[40] http://www.ars.usda.gov/is/pr/2010/100305.htm.

- 22 -

77.     The results of the Guelph study were published in BMC Medicine, a respected, peer reviewed publication.

78.     In 2012, a study published in Food Research International, a respected peer reviewed publication, used DNA barcoding to determine whether dietary supplements purporting to contain Ginseng actually contained the ingredient as represented. The study determined that half of the tested supplements purporting to be Korean Ginseng (Panax Ginseng) were actually American Ginseng (Panax quinquefolius), a different product. The authors of the study concluded that economic motivations were likely responsible in part for the deceptive and misleading labeling identified.

79.     Accordingly, in addition to the applicable federal regulations, Defendants knew, or should have known, of the need for vigilance in the manufacture, and truthfulness in the packaging, labeling, and distribution of dietary supplements.

80.     Despite the fact that DNA testing is the only testing that can confirm that the actual botanical is contained in the final supplement product, none of the Defendants test their herbal supplements with DNA barcoding.

**2.      Testing used by Defendants cannot determine whether the relevant botanical is actually present in the finished supplement, or in the amounts represented on the label**

81.     In general, manufacturers of herbal supplements use chemical-based tests in order to determine whether or not the finished herbal supplement is what the bottle purports that it is. Among the most common of these methods are thin layer chromatography (TLC) and high performance liquid chromatography (HPLC).

82.     Botanicals (*i.e.*, the plants, roots or leaves found in herbal supplements) generally possess a certain chemical profile that is used in connection with HPLC and TLC. These chemical profiles are published and sometimes referred to as monographs. For example, the

- 23 -

United States Pharmacopeial Convention (USP)[41] publishes monographs for the botanicals at issue in this case. These monographs are widely used by manufacturers of herbal supplements.

83.     These monographs will generally identify certain chemicals that can be found in a botanical, as well as their relative concentration in the botanical. For example, a USP monograph for dried flower buds of Lonicera japonica (Japanese Honeysuckle) states that there are several compounds which can be found in this plant, which should be tested for, such as caffeoylquinic acids, flavonoids, and iridoids. In practical terms, according to the monograph, if one were to perform chemical tests on the dried flower buds of Lonicera japonica, it would then expect to find neochlorogenic acid (a caffeoylquinic acid) in concentrations of .2-.8; and cryptochlorogenic acid in a ration of .3-.8. Manufacturers will then perform HPLC and TLC on the raw materials they acquire for third-party suppliers, to see if the chemical profile is consistent with the monographs.

84.     However, merely testing to see whether the chemical profile is consistent with a monograph, does not, and cannot, determine whether the relevant botanical is actually present in the raw material at issue, or in the finished supplement. All, or virtually all of the chemicals that herbal supplement manufacturers are testing for, are found in numerous other plants, and are also synthetically manufactured, and available for purchase.

85.     For example, a monograph for Echinacea[42] might direct that with regard to a sample, one measure the amount of echinacosides present in a sample, and, if the amount of echinacosides are present in a certain concentration, the relevant sample is Echinacea, since echinacosides in that concentration, are found in an Echinacea plant plucked from the wild.

---

[41] The USP describes itself as a "scientific non-profit organization that sets standards for the identity, strength, quality and purity of medicines, food ingredients, and dietary supplements manufactured, distributed and consumed worldwide." http://www.usp.org/about-usp.

[42] Echinacea is the genus name of a group of about nine flowering plants.

Echinacosides, however, is a generic term for a family of approximately a dozen compounds. Further, these Echinacosides can be found in many plants in the same family, such as lettuce, sunflowers or chickory. Chemically, however, whether these compounds come from Echinacea or sunflowers, they are indistinct.

86.     In another example, Ginkgo biloba[43] monographs often direct that one test for the presence of flavonol glycosides (sometimes referred to as Ginkgo flavonol glycosides). The term flavonol glycosides is a generic term that refers to a class of compounds, and not to a particular chemical. Ginkgo biloba monographs will often direct that one test for the presence of three types of flavonol glycosides: quercetin, kaempferol, and isorhamnetin. While these compounds are certainly found in Ginkgo biloba, these compounds are also found in most gymnosperms, such as pine or spruce. Further, the chemical structure of the quercetin, kaempferol, and isorhamnetin is the same whether it comes from Ginkgo or a spruce tree.

87.     St. John's Wort[44] monographs often dictate that one test for the presence of a compound called hypericin. The following is an image of a bottle of  Walmart's Spring Valley St. John's Wort that references hypericin:

---

[43] Ginkgo biloba is a type of tree with seeds and leaves, and which can grow to as high as 115 feet.

[44] St. John's Wort is a flowering plant that was native to Europe. Its scientific name is *hypericum perforatum*.

- 25 -



88.     This bottle also discloses the scientific name for St. John's Wort: hypericum perforatum, with hypericum being the genus that St. John's Wort belongs to, and perforatum being the species. While hypericin can be found in St. John's Wort, it is also found in many of the 400 or so plants that belong to the genus hypericum. Thus, at best, the presence of hypericin in a certain concentration indicates only that it is possible a sample is St. John's Wort.

89.     In addition to not being able to determine whether certain plant material can actually be found in a finished herbal supplement, or the raw materials that go into a supplement, the current chemical based testing methods used by manufacturers of herbal supplements, also are vague when differentiating between different species of the same plant. For example, there are two types of Echinacea commonly used in herbal supplements: Echinacea angustifolia and Echinacea purpurea. The following is an image of a bottle of Target up & up brand Echinacea that purports to contain Echinacea purpurea:



90.     The chemical profiles of these different species of Echinacea are very similar, and therefore, the chemical profiles make it difficult, if not impossible, to determine what type of Echinacea is being used. This is important because it is believed that while some Echinacea species possess medicinal qualities, others do not.

91.     Another shortcoming of the chemical based tests, is that they are unable to detect whether the compounds that are found in particular botanicals, are synthetic, rather than those naturally occurring in a plant. Synthetic versions of many of the chemicals that manufacturers test for, in an attempt to verify the presence of certain botanicals, can be purchased in synthetic form. For example, as discussed above, Ginkgo biloba monographs will often direct that one test for the presence of, among other things, quercetin. However, synthetic forms of quercetin are

010494-12  828506 V1

available for purchase over the internet.[45] There are also numerous scientific articles which provide instructions as to how one can synthetically manufacture compounds found in botanicals, and which are used to assist in the herbal supplement identification process.[46] The synthetic form of quercetin, as well as the form which comes from Ginkgo biloba (or other related plants), are indistinct.

92.     In addition to the fact that these chemical based tests fall short in identifying whether or not an herbal supplement contains what it purports to contain, these tests leave consumers significantly more exposed to adulteration of herbal supplements, than if other, more accurate methodologies were employed. Because the chemical based tests used by Defendants do not definitively identify the source from where the compounds originated, consumers are left to wonder about whether the ingredients in the herbal supplements they are ingesting are, in fact, the botanicals they intended to purchase.

**D.     Target's Herbal Supplements**

**1.     Target represents that its up & up brand of products offers high quality at low prices**

93.     In advertising and marketing its up & up brand products, Target represents that its "up & up" brands are sold at lower prices than but are equal in quality to national brands.

---

[45] *See, e.g.*, http://www.sigmaaldrich.com/catalog/search?term=quercitin&interface=All&N=0&mode=match%20partialmax&lang=en&region=US&focus=product.

[46] *See, e.g.*, *Total Synthesis of Ginkgolide A,* E.J. Corey and Arun K. Gosh, Tetrahedron Letters, Vol. 29, No. 26, pp. 3205-3206 (1988).

94.     During the June 2009 re-launch of its Target-brand as "up & up™", Target stated that its up & up brand of products, including household, health care, beauty, baby and personal care products, were of "great quality" and offered at "low prices."[47]

95.     In its June 24, 2009 press release, Target stated in part:

> Target announces the re-launch of Target brand – the company's core commodities owned brand – as up & up™, delivering low prices and great quality with an expanded product selection and a unique new design. . . .
> The up & up brand is equal in quality to national brands, but at a lower price, offering a savings of 30% on average. "Our guests are savvy and know they don't have to spend a lot to get high-quality products," said Mark Schindele, Senior Vice President of Merchandising, Target. "By re-launching Target brand as up & up, we're able to create a unique identity for this powerful owned brand. The new packaging incorporates an element of design, giving us the opportunity to deliver on both the 'expect more' and 'pay less' sides of our brand promise."[48]

**2.      Target represents that the Affected Target Products are what they purport to be.**

96.     Defendant Target makes representations on the labels of each of the following Target dietary supplement products – up & up "St. John's Wort," up & up "Gingko Biloba" and up & up "Valerian Root" ("Affected Target Products") – regarding the ingredients in the Affected Target Products.

97.     Target up & up "St. John's Wort" as stated on its label purports to contain 300 mg of "St. John's Wort (Hypericum perforatum) (aerial parts) Standardized extract (0.3% hypericin)" per serving, and to also contain "Dicalcium Phosphate, Maltodextrin, Microcrystalline Cellulose, Croscarmellose Sodium, Tricalcium Phosphate, Stearic Acid, Magnesium Stearate, Hypromellose, Hydroxypropyl Cellulose, [and] Polyethylene Glycol".

---

[47] Press Release, Target Corp., Target up & up Brand Offers Great Quality at Low Prices (June 24, 2009) (Available at http://pressroom.target.com/news/up-and-up-release).

[48] *Id.*

98.     Target up & up "Gingko Biloba" as stated on its label purports to contain 120 mg of "Ginkgo (Ginkgo Biloba) (Leaf) Standardized Extract (24% Flavone Glycosides, 6% Terpene Lactones)" per serving, and to also contain "Dicalcium Phosphate, Microcrystalline Cellulose, Croscarmellose Sodium, Stearic,  Magnesium Stearate, Hypromellose, Hydroxypropylcellulose, [and] Polyethylene Glycol."

99.     Target up & up "Valerian Root" as stated on its label purports to contain 90 mg of "Valerian (Valeriana Officinalis) (Root) (Standardized to a Minimum of 0.8% Valerenic Acids)" per serving, and to also contain "Microcrystalline Cellulose, Gelatin, Maltodextrin, Magnesium Stearate, [and] Silicon Dioxide."

100.     A reasonable consumer would expect, as Plaintiffs did, that the label statements regarding the identity, quantity, and purity of the Affected Target Products would be truthful and not deceptive or misleading.

**3.     Target sources its up & up dietary supplements from third parties but fails to verify that the products are what they are represented to be.**

101.     Target hires third parties to supply, manufacture and label the Affected Target Products under its up & up brand.

102.     Target does not independently verify that the up & up herbal supplements Target sells, including the Affected Target Products, are what they are represented to be and contain the ingredients listed on the labels. Nor does Target require its suppliers to test the Affected Target Products with DNA barcoding.

103.     Target relies upon third party vendors' and suppliers' representations that labeling for its up & up herbal supplements, including the Affected Target Products, are in compliance with all applicable legal requirements.

- 30 -

104.     Nonetheless, under DSHEA and relevant state consumer protection and warranty statutes and common law, Target has the ultimate responsibility for and obligation to ensure that the dietary supplements it sells, including the Affected Target Products, are what they are represented to be and contain the ingredients listed on the labels.

**4.     Testing establishes that the Affected Target Products do not contain the ingredients as represented on the labels.**

105.     In a February 2, 2015 letter to Target's CEO, Brian Cornell, the New York Attorney General, stated that it purchased six up & up herbal supplements from three different New York state Target locations. The herbal supplements purchased were Ginkgo Biloba, St. John's Wort, Valerian Root, Garlic, Echinacea and Saw Palmetto (hereinafter, Ginkgo Biloba, St. John's Wort, and Valerian Root will be referred to as the "Affected Target Products").

106.     The New York Attorney General informed Target that genetic testing revealed that the Affected Target Products did not contain the ingredients as represented on their labels. The tests further revealed the presence of adulterants and undisclosed substances that were not listed on the labels, and concluded that the Affected Target Products "were either unrecognizable or a substance other than what they claimed to be, and therefore fairly constitute contaminated or substituted products."

107.     The tests concluded that the Affected Target Products did not contain any of the ingredient (St. John's Wort, Gingko Biloba, Valerian  Root) identified on the Affected Target Products' labeling:

a.     Target up & up "St. John's Wort" contained oryza [rice], allium [Garlic], and dracaena [the genus encompassing the common houseplant], but "[n]o St. John's Wort DNA was identified";

b.     Target up & up "Gingko Biloba" contained orzya, allium, and mung/French bean, but "no Gingko Biloba DNA was identified";

c.     Target up & up "Valerian Root" contained oryza, allium, wild carrot, Saw Palmetto, phasolus/beans, phasolus fabacaeae, and pea family DNA, but "[n]o Valerian Root DNA was identified."

108.    While some of the up & up Ginkgo Biloba samples contained other substances such as rice, allium and mung/French Bean, the presence of these three ingredients were not disclosed on the up & up Ginkgo packaging.

109.    While some of the up & up St. John's Wort samples revealed the presence of rice, allium, and dracaena, all of which are unrelated to St. John's Wort, the presence of these ingredients was not disclosed on the up & up St. John's Wort packaging.

110.    While some of the up & up Valerian Root samples revealed the presence of allium, phasolus/beans, rice, asparagaccea, peas, wild carrot, Saw Palmetto, and phaseolus fabacaeae, all of which are unrelated to Valerian Root, the presence of these ingredients was not disclosed on the up & up Valerian Root packaging.

111.    Even in cases where the genetic tests on one of the up & up Herbal Supplements revealed the presence of the correct ingredient, many of the tests revealed the complete absence of the ingredient on the same product, thus, leaving a consumer completely unsure whether they got "lucky" and purchased one of the bottles that contained the proper ingredients.

**5.    Plaintiffs and the Target Classes would not have purchased the Affected Target Products had they known the truth.**

112.    Target failed to disclose on its labels or otherwise that the Affected Target Products do not contain the ingredients represented on the Affected Target Products' labels or that the Affected Target Products contain adulterants or undisclosed substances.

- 32 -

113.    The actual contents of the Affected Target Products are important to Plaintiffs and members of the Class. Target's failure to disclose that the Affected Target Products do not contain the ingredients as represented on the labels and that the Affected Target Products contain adulterants or undisclosed substances affected Plaintiffs' and Class members' purchasing decisions in that they would not have purchased the Affected Target Products had Target disclosed the true facts concerning their actual ingredients and composition.

114.    In its Form 10-K filed with the Securities and Exchange Commission (for the year ending January 31, 2015), Target states: "A significant portion of our sales is from national brand merchandise. Approximately one-third of 2014 sales related to our owned and exclusive brands."[49] Target's up & up is one of Target's owned and exclusive brands. In its Form 10-K, Target further states:

> We sell many products under our owned and exclusive brands. These brands are an important part of our business because they differentiate us from other retailers, generally carry higher margins than equivalent national brand products and represent a significant portion of our overall sales. If one or more of these brands experiences a loss of the consumer acceptance or confidence, our sales and gross margins could be adversely affected.[50]

115.    Target further recognizes the materiality and importance of the quality and safety of its products to its customers and to Target. Target states in its recent SEC Form 10-K filing:

> **Failure to address product safety concerns could adversely affect our sales and results of operations.**
>
> If our merchandise offerings, including food, drug and children's products, do not meet applicable safety standards or our guests' expectations regarding safety, we could experience lost sales and increased costs and be exposed to legal and reputational risk. All of our vendors must comply with applicable product safety laws, and we are dependent on them to ensure that the products we buy

---

[49] Target Corp., Annual Report, at 3 (Form 10-K) (Jan. 31, 2015).

[50] *Id.* at 5.

> comply with all safety standards. Events that give rise to actual, potential or perceived product safety concerns, including food or drug contamination, could expose us to government enforcement action or private litigation and result in costly product recalls and other liabilities. In addition, negative guest perceptions regarding the safety of the products we sell could cause our guests to seek alternative sources for their needs, resulting in lost sales. In those circumstances, it may be difficult and costly for us to regain the confidence of our guests.[51]

116.    Plaintiffs and the Target Class were misled and deceived by Target's material misrepresentations and omissions and were damaged and injured as a result of Target's conduct because:

a.    They would not have purchased the Affected Target Products had they known that the Affected Target Products did not contain the ingredients as represented on the labels, and/or contained adulterants or undisclosed substances; and/or

b.    They did not receive the benefit of the bargain and/or suffered out of pocket loss because The value they received from the Affected Target Products was less than the price they paid to purchase the Affected Target Products due to the misrepresentations and omissions in the Affected Target Products' labeling, as described above; and/or

c.    The Affected Target Products were worthless and had no value due to Target's misrepresentations, omissions, untrue, misleading and deceptive statements and mislabeling, as described above.

---

[51] *Id.* at 9.

- 34 -

**E.      Walgreen's Herbal Supplements**

     **1.      Walgreens represents that its Finest Nutrition supplements will help consumers be "happy and healthy."**

117.    Walgreens aims to be "a global leader in pharmacy, health and well-being solutions and the first choice for health and daily living" with "strategies designed to further transform [its] traditional drugstore into a 'retail health and daily living' store, creating community-centric healthcare integration with expanded pharmacy, health and wellness solutions…."[52]

118.    According to Walgreens, "[m]aintaining consistent product quality, competitive pricing, and availability of private brand offerings … is important in developing and maintaining customer loyalty."[53]

119.    Walgreens markets itself to customers as being "at the corner of healthy and happy":



120.    Moreover, Walgreens markets its Finest Nutrition products as a way for customers to get to the corner of "happy and healthy." For example, in a television commercial titled "Corner of Good Intentions and Powdered Donuts,"[54] Walgreens features a husband eating a donut and a wife with a bottle of Finest Nutrition supplements sitting at the kitchen table:

---

[52] Walgreens' Annual Report on Form 10-K for the Fiscal Year Ended August 31, 2014.

[53] *Id.*

[54] http://www.ispot.tv/ad/7w1d/walgreens-corner-of-good-intentions-and-powdered-donuts



The narrator states: "Many New Year's resolutions have unraveled at the corner of good intentions and powdered donuts. But Walgreens can help you make a healthy change … before you get too far off track. We've got the tools, advice and products you need to trade your old habits for new routines." The narrator then states that Finest Nutrition products are for sale at buy one, get one half off.

**2. Walgreens represents that the Affected Walgreens Products are what they purport to be.**

121.    Defendant Walgreens makes representations on the labels of each of the following Walgreen's dietary supplement products – Finest Nutrition Gingko Biloba, St. John's Wort, Ginseng, Garlic, and Echinacea ("Affected Walgreens Products") – regarding the ingredients in the Affected Walgreens Products.

122.    A Finest Nutrition label is reproduced below:

- 36 -



123.    Throughout the Class Period, the packaging for Walgreens' Finest Nutrition products has consistently included "Supplement Facts" representing that each capsule contains a specific amount of a particular supplement.

a.      Walgreens' Finest Nutrition Double Strength Gingko Biloba – this product is represented to contain 120 milligrams of "Gingko Biloba Extract (Gingko Biloba) (leaf) (Standardized to contain 24% Gingko Flavone Glycosides, 28 mg)" per serving, as well as "Rice Flour, [and] Gelatin." The "Supplement Facts" for this product also claims that the product "[c]ontains <2% of: Silica, [and] Vegetable Magnesium Stearate";

- 37 -



    b.      Walgreens' Finest Nutrition St. John's Wort – According to its

"Supplement Facts," this product contains 300 milligrams of "St. John's Wort Extract

(Hypericum perforatum) (aerial) (Standardized to contain 0.3% Hypericin, 0.9 mg)" per serving,

and "Maltodextrin, Gelatin, Magnesium Silicate, Vegetable Magnesium Stearate, [and] Silica";



    c.      Walgreens' Finest Nutrition Ginseng – The "Supplement Facts" represents

that the product contains 200 milligrams of "Korean Ginseng … (Panax Ginseng) (root)

standardized to contain 7% Ginsenosides, 14 mg)" per serving. It also lists other ingredients of

the product as "Maltodextrin, Gelatin, Cellulose (Plant Origin), Silica, [and] Vegetable

Magnesium Stearate";

010494-12  828506 V1



      d.    Walgreens' Finest Nutrition Odorless Garlic – The "Supplement Facts"

represents that the product contains 10 milligrams of "Odorless Garlic … (Allium sativum)

(bulb) … (a 100:1 extract equivalent to 1,000 mg of fresh Garlic Bulb)" per serving, as well as

other ingredients of "Soybean Oil, Gelatin [and] Glycerin";



      e.    Walgreens' Finest Nutrition Echinacea – This product's "Supplement

Facts" represents that the product contains 125 milligrams of "Echinacea Extract … (Echinacea

purpurea) (whole plant and root) (Standardized to 4% of Phenolic Compounds)" per serving, and

- 39 -

"Calcium Carbonate, Cellulose (Plant Origin), Silica, Polyethylene Glycol, Croscarmellose, Providone, Corn Starch, [and] Magnesium Stearate."



124.    A reasonable consumer would expect, as Plaintiffs did, that the label statements regarding the identity, quantity, and purity of the Affected Walgreens Products would be truthful and not deceptive or misleading.

**3.    Walgreens sources its Finest Nutrition dietary supplements from third parties but fails to verify that the products are what they are represented to be.**

125.    Walgreens hires third parties to supply, manufacture and label the Affected Walgreens Products under its Finest Nutrition brand.

126.    Walgreens does not independently verify that the Finest Nutrition herbal supplements Walgreens sells, including the Affected Walgreens Products, are what they are represented to be and contain the ingredients listed on the labels. Nor does Walgreens require its suppliers to conduct DNA barcoding.

- 40 -

127.    Walgreens relies upon third party vendors' and suppliers' representations that labeling for its Finest Nutrition herbal supplements, including the Affected Walgreens Products, are in compliance with all applicable legal requirements.

128.    Walgreens provides in its vendor contract that Walgreens is under no obligation to inspect goods received from its vendor suppliers before resale of the goods by Walgreens to the public.

129.    Nonetheless, under DSHEA and relevant state consumer protection and warranty statutes and common law, Walgreens has the ultimate responsibility for and obligation to ensure that the dietary supplements it sells, including the Affected Walgreens Products, are what they are represented to be and contain the ingredients listed on the labels.

### 4.    Testing establishes that the Affected Walgreens Products do not contain the ingredients as represented on the labels.

130.    In a February 2, 2015 letter to Walgreens' President, Alexander Gourlay, the New York Attorney General demanded that Walgreens "cease and desist engaging in the sale of adulterated and/or mislabeled herbal dietary supplements, and in particular to immediately stop the sale of five 'Finest Nutrition' dietary supplements."

131.    The letter followed testing conducted by the Attorney General's expert, who performed testing on six types of purported herbal supplements sold by Walgreens under the Finest Nutrition brand: Gingko Biloba, St. John's Wort, Ginseng, Garlic, Echinacea, and Saw Palmetto. The samples were purchased from three representative Walgreens stores in Brooklyn, Rochester, and Watertown, New York. Each sample was tested five times and generated 90 results. The DNA barcoding testing revealed that 5 out of the 6 types of supplements, the Affected Walgreens Products, did not contain the ingredients they purported to have and were contaminated with other plant material or ingredients not listed on the products' labels.

- 41 -

132.    None of the 15 samples of Walgreens' Finest Nutrition Gingko Biloba that were tested contained Gingko Biloba. Rather, the only ingredient found was oryza, commonly known as rice, which is not disclosed on the product's label. ██████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████

133.    None of the 15 samples of Walgreens' Finest Nutrition St. John's Wort that were tested contained St. John's Wort. Only three of the 15 tests showed some plant matter, in particular, allium (garlic), oryza, and dracaena, a tropical houseplant, all of which are not disclosed on the product's label. The other 12 tests did not even reveal any plant matter.

134.    Fifteen samples of Walgreens' Finest Nutrition Ginseng were tested, which also revealed no presence of Ginseng in the supplements. Instead, of the 15 tests performed, allium was found in two of the tests, and oryza was found in six other tests, both of which are not listed on the label. ████████████████████████████████████████████

████████████████████████████████████████

135.    Fifteen samples of Walgreens' Finest Nutrition Garlic revealed ingredients that are not listed on the product label, in particular palm, dracaena, wheat, and oryza. Allium was found in only one of the 15 tests performed. Yet, the label claims that the product contains no wheat, among other things. ██████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

- 42 -

136.    None of the 15 samples of Walgreens' Finest Nutrition Echinacea tested contained Echinacea, and many of the samples tested showed no presence of any plant material at all. Several of the tests revealed allium, oryza, and daisy, which are all unrelated to Echinacea and not disclosed on the label.

137.    The results of the independent testing demonstrate that Walgreens' previous assertions – including that it has "stringent requirements" and proactively works with suppliers "to ensure the quality and safety" of its private label products – were not true.[55]

**5.    Plaintiffs and the Walgreens Classes would not have purchased the Affected Walgreens Products had they known the truth.**

138.    Walgreens failed to disclose on its labels or otherwise that the Affected Walgreens Products do not contain the ingredients represented on the Affected Walgreens Products' labels or that the Affected Walgreens Products contain adulterants or undisclosed substances.

139.    The actual contents of the Affected Walgreens Products are important to Plaintiffs and members of the Class. Walgreens' failure to disclose that the Affected Walgreens Products do not contain the ingredients as represented on the labels and that the Affected Walgreens Products contain adulterants or undisclosed substances affected Plaintiffs' and Class members' purchasing decisions in that they would not have purchased the Affected Walgreens Products had Walgreens disclosed the true facts concerning their actual ingredients and composition.

140.    Walgreens recognizes the materiality and importance of the quality and safety of its products to its customers. For example, in its Form 10-K filed with the Securities and Exchange Commission for the year ending August 31, 2014, Walgreens stated:

---

[55] *See* http://www.walgreens.com/topic/sr/sr_product_integrity_home.jsp (last visited Mar. 1, 2015).

We plan to continue pursuing our goal to become a global leader in pharmacy, health and well-being solutions and the first choice for health and daily living in communities we serve, all designed to help our customers get, stay and live well….. Maintaining consistent product quality, competitive pricing, and availability of our private brand offerings for our customers is important in developing and maintaining customer loyalty.

141.    Similarly, in its Form 10-K filed with the SEC for the year ending August 31, 2015, Walgreens stated:

Our global brands portfolio is enhanced by our in-house new product research and development and manufacturing capabilities. We seek to further drive innovative ways to address global health and wellness challenges. We believe we are well positioned to expand customer offerings in existing markets and become a health and wellbeing partner of choice in emerging markets… Maintaining consistent product quality, competitive pricing, and availability of our private brand offerings for our customers is important in differentiating us from other retailers and developing and maintaining customer loyalty.

142.    Plaintiffs and the Walgreens Classes were misled and deceived by Walgreens' material misrepresentations and omissions and were damaged and injured as a result of Walgreens' conduct because:

a.    They would not have purchased the Affected Walgreens Products had they known that the Affected Walgreens Products did not contain the ingredients as represented on the labels, and/or contained adulterants or undisclosed substances; and/or

b.    They did not receive the benefit of the bargain and/or suffered out of pocket loss due to the misrepresentations and omissions in the Affected Walgreens Products' labeling, as described above; and/or

c.    The Affected Walgreens Products were worthless and had no value due to Walgreens' misrepresentations, omissions, untrue, misleading and deceptive statements and mislabeling, as described above.

- 44 -

**F.      Walmart's Herbal Supplements**

**1.      Walmart represents that its Spring Valley brand of products offers high quality at low prices**

143.      Walmart markets itself as the place to "Save money. Live better.":



144.      Walmart markets its Spring Valley brand vitamins and supplements as one way to "Save Money. Live Better." Walmart markets its Spring Valley products as "America's #1 brand of high quality vitamins and supplements" at "guaranteed low prices," calling Walmart the "trusted destination for healthy savings."[56]

145.      For example, in a television commercial titled "High School Reunion,"[57] Walmart features a couple getting ready for their Class of 1994 reunion and explains all the reasons why they need Spring Valley vitamins, including "to feel healthy," to be able to dance, to feel like you have "energy":



The narrator states: "Shop the whole line of Spring Valley Vitamins now."

_____

[56] https://www.youtube.com/watch?v=inny6iUcZoo

[57] http://www.ispot.tv/ad/7uQN/walmart-spring-valley-vitamins-high-school-reunion

- 45 -

## 2. Walmart represents that the Affected Walmart Products are what they purport to be

146.     Defendant Walmart makes representations on the labels of each of the following Walmart dietary supplement products – Spring Valley Gingko Biloba, St. John's Wort, Ginseng, Garlic, Echinacea, and Saw Palmetto ("Affected Walmart Products") – regarding the ingredients in the Affected Walmart Products.

147.     Each Spring Valley product offered by Walmart contains a product label or online information containing, among other things, the ingredients and purported health benefit provided by that product, as well as whether certain properties are not contained in the product, such as gluten or lactose. Each product also contains a "quality assurance guarantee" that it is "produced under strict quality guidelines" and "verified by an independent, ISO 9001-2000 certified laboratory."

148.     In addition to statements on product labels, agents of Walmart routinely assert that Spring Valley products contain the ingredients as described on the products. For example, in response to the question "what are all the ingredients in this product" posed online by a consumer regarding Spring Valley Echinacea on the answers.walmart.com forum, the certified "Walmart Product Expert" stated "This product contains Echinacea Purpurea (aerial part), gelatin, and medium chain triglycerides."[58] Similar representations have been made regarding each of the Affected Walmart Products.

149.     Walmart claims that its Spring Valley St. John's Wort capsules contain only St. John's Wort, maltodextrin, gelatin, magnesium sulfate, silica, and vegetable magnesium stearate.

---

[58]

http://answers.walmart.com/answers/1336/product/10416573/questions.htm?expandquestion=1732766 (accessed October 14, 2015).

150.     The product label states that the product contains no gluten, yeast, wheat, milk or milk derivatives, lactose, sugar, preservatives, soy, artificial color, artificial flavor, or sodium.

151.     Walmart claims that St. John's Wort is meant to promote "mood health," and that "St. John's Wort helps promote a positive mood and a healthy emotional balance." Below is a sample product label:



152.     Walmart claims that its Spring Valley St. John's Wort capsules contain only St. John's Wort, gelatin, arrowroot, and medium chain triglycerides. Below is a sample product label:



153.     Walmart claims that its Spring Valley Ginseng capsules contain only Ginseng, maltodextrin, gelatin, cellulose (plant origin), silica, and vegetable magnesium stearate.

154.     The product label states that the product contains no gluten, yeast, wheat, milk or milk derivatives, lactose, sugar, preservatives, soy, artificial color, artificial flavor, or sodium.

- 47 -

155.    Walmart claims that Ginseng promotes "general wellness," and that "Ginseng promotes physical performance by revitalizing and rejuvenating the entire body. Ginseng contains ginsenosides – bioactive factors that play a role in well-being." Below is a sample product label:



156.    Walmart claims that its Spring Valley Odorless Garlic softgels contain only garlic, soybean oil, gelatin, and glycerin.

157.    The product label states that the product contains no gluten, yeast, wheat, milk or milk derivatives, lactose, sugar, preservatives, artificial color, artificial flavor, or sodium.

158.    Walmart claims that Garlic promotes "heart health," and that "Garlic is traditionally used to promote heart and cardiovascular health. Odorless Garlic contains the natural goodness of Garlic in a convenient-to-use softgel." Below is a sample product label:



159.    Walmart claims that its Spring Valley Saw Palmetto capsules contain only Saw Palmetto, gelatin, and vegetable magnesium stearate.

- 48 -

160.     The product label states that the product contains no gluten, yeast, wheat, milk or milk derivatives, lactose, sugar, preservatives, artificial color, artificial flavor, or sodium. Walmart claims that Saw Palmetto promotes "prostate health," and that "Saw Palmetto has been traditionally used to support prostate and urinary health." Below is a sample product label:



161.     Walmart claims that its Spring Valley Echinacea capsules contain only Echinacea, gelatin, and medium chain triglycerides.

162.     Walmart claims that Echinacea promotes "immune health," and that "Echinacea nutritionally supports healthy immune function. Native to the United States and used by the Plains Indians more than any other plant, it is also known as purple coneflower. Introduced to settlers as they moved west in the 1800's, it is still used today for its many nutritional benefits." Below is a sample product label:

- 49 -



163.    Walmart claims that its Spring Valley Gingko Biloba tablets contain only Gingko

biloba, cellulose (plant origin), dicalcium phosphate, croscarmellose, silica, cellulose coating,

maltodextrin, natural palm leaf glaze, polysorbate 80, triacetin, vegetable magnesium stearate,

and vegetable stearic acid.

164.    The product label states that the product contains no gluten, yeast, wheat, milk or

milk derivatives, lactose, sugar, preservatives, soy, artificial color, artificial flavor, or sodium.

165.    Walmart claims that Gingko Biloba promotes "memory support," and that

"Gingko helps support memory, especially occasional mild memory problems associated with

aging. Gingko also possesses antioxidant properties that may help neutralize cell-damaging free

radicals." Below is a sample product label:



- 50 -

166.     A reasonable consumer would expect, as Plaintiffs did, that the label statements regarding the identity, quantity, and purity of the Affected Walmart Products would be truthful and not deceptive or misleading.

**3.      Walmart sources its Spring Valley dietary supplements from third parties but fails to verify that the products are what they are represented to be**

167.     Walmart hires third parties to supply, manufacture and label the Affected Target Products under its Spring Valley brand.

168.     Walmart does not independently verify that the Spring Valley herbal supplements Walmart sells, including the Affected Walmart Products, are what they are represented to be and contain the ingredients listed on the labels. Nor does Walmart require its supplies to do DNA barcoding.

169.     Walmart relies upon third party vendors' and suppliers' representations that labeling for its Spring Valley herbal supplements, including the Affected Walmart Products, are in compliance with all applicable legal requirements.

170.     Nonetheless, under DSHEA and relevant state consumer protection and warranty statutes and common law, Walmart has the ultimate responsibility for and obligation to ensure that the dietary supplements it sells, including the Affected Walmart Products, are what they are represented to be and contain the ingredients listed on the labels.

**4.      Testing establishes that the Affected Walmart Products do not contain the ingredients as represented on the labels.**

171.     In a February 2, 2015 letter to Walmart's President and CEO, Doug McMillon, the New York Attorney General's office stated that it had purchased six Walmart brand Spring Valley herbal supplements products from three different Walmart locations in New York state. The products purchased from Walmart were Ginkgo Biloba, St. John's Wort, Ginseng, Garlic, Echinacea and Saw Palmetto.

- 51 -

172.     The Attorney General's office conducted multiple rounds of DNA barcode testing on each product, yielding 90 results in total. The test results showed that 40% of the samples contained plant material other than what was listed on the product label. Most disturbingly, **only 4%** of the Walmart samples contained DNA that actually matched the contents of the product label. The results for each supplement tested are summarized below.

173.     With respect to Ginkgo Biloba, none of the samples tested by the Attorney General's office contained any Ginkgo DNA. Some samples revealed the presence of rice, dracaena (a houseplant), mustard, wheat and radish. The presence of these ingredients was not disclosed on the Spring Valley packaging. Moreover, the product label expressly claimed that there was no wheat or gluten present in the product.

174.     With respect to St. John's Wort, none of the samples tested by the Attorney General's office contained any St. John's Wort DNA. Many of the samples tested showed no evidence of any plant material at all. Several tests showed the presence of materials such as rice, Garlic, and cassava. The presence of these ingredients was not disclosed on the Spring Valley packaging.

175.     With respect to Ginseng, none of the samples tested by the Attorney General's office contained any Ginseng DNA. The samples tested showed the presence of rice, dracaena, *Pinus strobus* (Eastern white pine), wheat/grass, and citrus. The presence of these ingredients was not disclosed on the Spring Valley packaging. Moreover, the product label expressly claimed that there was no wheat or gluten present in the product.

176.     With respect to Garlic, only one of 15 samples tested by the Attorney General's office showed the presence of Garlic DNA. Other tests identified rice, *Pinus* spp. (pine tree), and genetic material of palm, dracaena, and wheat. The presence of these ingredients was not

- 52 -

disclosed on the Spring Valley packaging. Moreover, the product label expressly claimed that there was no wheat or gluten present in the product.

177.    With respect to Saw Palmetto, only three of 15 samples tested by the Attorney General's office showed Saw Palmetto DNA. Three samples contained Garlic, and six samples contained rice. The presence of these ingredients was not disclosed on the Spring Valley packaging.

178.    With respect to Echinacea, none of the samples tested by the Attorney General's office contained any Echinacea DNA at all.

179.    The Attorney General's office demanded that Walmart "cease and desist engaging in the sale of adulterated and/or mislabeled herbal dietary supplements" and immediately stop the sale of certain lots of the products at issue.

180.    Walmart continues to sell other lots and versions of the above herbal supplements, which upon information and belief, remain available online and at Walmart locations throughout the United States.

181.    Even in cases where the genetic tests on one of the Spring Valley Herbal Supplements revealed the presence of the correct ingredient, many of the tests revealed the complete absence of the ingredient on the same product, thus, leaving a consumer completely unsure whether they got "lucky" and purchased one of the bottles that contained the proper ingredients.

**5.    Plaintiffs and the Walmart Classes would not have purchased the Affected Walmart Products had they known the truth**

182.    Walmart failed to disclose on its labels or otherwise that the Affected Walmart Products do not contain the ingredients represented on the Affected Walmart Products' labels or that the Affected Walmart Products contain adulterants or undisclosed substances.

- 53 -

183.     The actual contents of the Affected Walmart Products are important to Plaintiffs and members of the Class. Walmart 's failure to disclose that the Affected Walmart Products do not contain the ingredients as represented on the labels and that the Affected Walmart Products contain adulterants or undisclosed substances affected Plaintiffs' and Class members' purchasing decisions in that they would not have purchased the Affected Walmart Products had Walmart disclosed the true facts concerning their actual ingredients and composition.

184.     Walmart recognizes the materiality and importance of the quality and safety of its products to its customers. In fact, Walmart explains how it earns the "trust" of consumers:

> Leading on price is designed to earn the trust of our customers every day by providing a broad assortment of **quality merchandise** and services at everyday low prices ("EDLP"), while fostering a culture that rewards and embraces mutual respect, integrity and diversity.[59]

185.     Walmart further states in its recent SEC Form 10-K filing:

> **Our customers count on us to provide them with safe products.** Concerns regarding the safety of food and non-food products that we source from our suppliers and then sell could cause customers to avoid purchasing certain products from us, or to seek alternative sources of supply for all of their food and non-food needs, even if the basis for the concern is outside of our control. Any lost confidence on the part of our customers would be difficult and costly to reestablish. As such, any issue regarding the safety of any food and non-food items we sell, regardless of the cause, could adversely affect our financial performance.[60]

186.     Plaintiffs Victoria Shahrashian, John Burns, Louise L. Williams, Charles J. Haje, Melissa Harris, Dale Kardasz, and Elizabeth Anne Stokes and the Walmart Classes were misled and deceived by Walmart's material misrepresentations and omissions and were damaged and injured as a result of Walmart's conduct because:

---

[59] Walmart's Form 10-K for fiscal year ended January 31, 2015, at 7 (emphasis supplied).

[60] *Id*. at 24 (emphasis supplied).

- 54 -

a.      They would not have purchased the Affected Walmart Products had they known that the Affected Walmart Products did not contain the ingredients as represented on the labels, and/or contained adulterants or undisclosed substances; and/or

b.      They did not receive the benefit of the bargain and/or suffered out of pocket loss due to the misrepresentations and omissions in the Affected Walmart Products' labeling, as described above; and/or

c.      The Affected Walmart Products were worthless and had no value due to Walmart's misrepresentations, omissions, untrue, misleading and deceptive statements and mislabeling, as described above.

**G.      The Retailers' Suppliers, Including NBTY, are Also Responsible for the Misrepresentations, Omissions, and Mislabeling of the Affected Products**

187.      NBTY purchases raw materials and manufactures herbal supplements, which it then markets through wholesale, e-commerce, and retail.  NBTY sells its herbal supplements products directly to consumers through its Vitamin World retail stores and through its website. It also sells the supplements wholesale to major retailers in the United States, including Walgreens, Target, Walmart, Costco, CVS, and Kroger.[61]

188.      The retailers place purchase orders for herbal supplements with NBTY. NBTY packs and labels the herbal supplement products with the retailers' proprietary brand labels. All labels are approved by NBTY's corporate office in New York.

189.      The retailers then market, distribute, and sell the herbal supplements to consumers under their proprietary brands.

---

[61] *See* NBTY, Inc. Annual Report on the Form 10-K for the Fiscal Year Ended September 30, 2014.

- 55 -

190.     In 2014, NBTY's net sales for its wholesale segment totaled $1.88 billion.[62]

191.     In 2014, Walmart constituted 19% of NBTY's net sales for its wholesale segment, and 11% of NBTY's sales across all segments.[63]

192.     NBTY claims that one of its operating principles is to "provide the highest quality products and services on time, first time, every time." It further claims that "consumer safety is always our top priority."[64]

193.     The Attorney General's investigation has revealed that herbal supplements supplied by NBTY to Walmart, Walgreens, and Target did not contain the advertised herbal ingredients.

194.     Because the herbal supplements manufactured, packaged, labeled, and sold by NBTY to Target, Walgreens, and Walmart did not contain the advertised herbal ingredients, Plaintiffs and the Classes have suffered damages.

## V.     CLASS ACTION ALLEGATIONS

195.     Plaintiffs Kaitlyn Pirtle, Linda Lee Boss, Justin Allsup, Jennifer Chamberlin, Martin Angiulli, and Joel Cohn bring this action pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the members of the following Class during the period January 1, 2009, through the present ("Class Period"):

> **"Target Class":** All persons who paid, in whole or in part, for Target's "up & up" brand St. John's Wort, Gingko Biloba, and/or Valerian Root during the Class Period.

---

[62] *Id.*

[63] *Id.*

[64] *See* http://www.nbty.com/OurCompany/OperatingPrinciples, (last viewed October 9, 2015.)

196.    Plaintiffs Varonica Beal, Donald J. Weeks, Justin Allsup, Melissa Harris, William

Patrick Mobley, Nilsa Cintron, Martin Angiulli, Carolyn Stevens, and Russell Marks bring this

action pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on

behalf of themselves and the members of the following Class during the period January 1, 2009,

through the present ("Class Period"):

> "**Walgreens Class":** All persons who paid, in whole or in part, for
> Walgreens' "Finest Nutrition" Gingko Biloba, St. John's Wort,
> Ginseng, Garlic, and/or Echinacea during the Class Period.

197.    Plaintiffs Kristin Pirtle, Victoria Shahrashian, John Burns, Louise L. Williams,

Charles J. Haje, Melissa Harris, Dale Kardasz, Brenda Viera, Martin Angiulli, Carolyn Stevens,

and Elizabeth Anne Stokes bring this action pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the

Federal Rules of Civil Procedure, on behalf of themselves and the members of the following

Class during the period January 1, 2009, through the present ("Class Period"):

> **"Walmart Class":** All persons who paid, in whole or in part, for
> Walmart's "Spring-Valley" Gingko Biloba, St. John's Wort,
> Ginseng, Garlic, Echinacea, and Saw Palmetto during the Class
> Period.

198.    The Target, Walgreens, and Walmart Classes are hereinafter collectively referred

to as the Classes. Excluded from the Classes are Defendants, any entity in which Defendants

have a controlling interest or which has a controlling interest in a Defendants, and Defendants'

legal representatives, predecessors, successors, assigns, and employees, as well as governmental

entities.

199.    The definitions of the Classes are unambiguous. The respective Plaintiffs are

members of the Classes they seek to represent. Records kept by the Defendants identify the Class

members who purchased the Affected Products, and/or Class members can objectively identify

whether they purchased the Affected Products. The members of the Classes can be notified of the

Class action through publication and direct mailings to address lists maintained in the usual course of business by Defendants.

200.    Pursuant to Rule 23(a)(1), the members of the Classes are so numerous that their individual joinder is impracticable. The precise number of Class members is unknown to Plaintiffs, but that number greatly exceeds the number to make joinder impossible.

201.    Pursuant to Rule 23(a)(2) and (b)(3), questions of fact and law, except as to the amount of damages each member of the Classes sustained, are common to each Class. Common questions of law and fact predominate over the questions affecting only individual Class members. Some of the common legal and factual questions include:

a.    Whether the Affected Products were sold in containers with packaging identifying them as containing a particular botanical (*e.g.*, St. John's Wort, Gingko Biloba, Valerian Root, Echinacea, Ginseng, or Saw Palmetto);

b.    Whether, contrary to the product packaging, the Affected Products did not contain the botanical identified on the packaging;

c.    Whether Defendants manufactured and/or sold the Affected Products;

d.    Whether the Affected Products contained ingredients that were not disclosed on the packaging;

e.    Whether a reasonable consumer would be misled or deceived by the Affected Products' packaging;

f.    Whether Defendants' conduct violated the consumer laws of various states that prohibit unfair or deceptive practices or consumer fraud;

g.    Whether Defendants breached express or implied warranties;

- 58 -

h.      Whether Defendants were unjustly enriched by selling the Affected

Products;

i.      Whether Defendants defrauded Plaintiffs and members of the Class; and

j.      The nature and extent of damages and other remedies to which the conduct

of Defendants entitles Plaintiffs and the Class members.

202.    Each Defendant engaged in a common course of conduct giving rise to the legal

rights sought to be enforced by Plaintiffs and the Classes. Individual questions, if any, pale by

comparison to the numerous common questions that predominate.

203.    The injuries sustained by the Class members flow, in each instance, from a

common nucleus of operative facts - each Defendants' misconduct. Each Class member

purchased Affected Products that failed to contain the primary botanical listed on the label and/or

contained ingredients that were not disclosed on the packaging.

204.    Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the other

members of the Classes they respectively seek to represent. Plaintiffs, like other members of the

Classes, purchased one or more Affected Products that did not contain the primary ingredients

listed and the packaging and that such supplements were supposed to contain and/or contained

ingredients that were not disclosed on the packaging or label. Plaintiffs were subject to, and were

financially harmed by, a common policy and practice applied by each Defendant to the

respective Class members.

205.    Pursuant to Rule 23(a)(4) and (g)(1), Plaintiffs will fairly and adequately protect

the interests of the Class. Plaintiffs are familiar with the basic facts that form the bases of the

Class members' claims. Plaintiffs' interests do not conflict with the interests of the other Class

members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class action litigation and intend to prosecute this action vigorously.

206. Pursuant to Rules 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

207. Individual litigation of the legal and factual issues raised by the conduct of the Defendants would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court.

## VI. TOLLING OF STATUTE OF LIMITATIONS

208. Any applicable statute of limitations has been tolled by the Defendants' knowing and active concealment of its deceptive practices. Plaintiffs and members of the Class could not have reasonably discovered the true extent of the Defendants' deception with regard to the Affected Products, until the New York Attorney General disclosed the results of its studies on the Defendants' herbal supplements.

209. As a result of the active concealment by the Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

- 60 -

## VII.    CAUSES OF ACTION

### COUNT I

### VIOLATION OF STATE CONSUMER PROTECTION LAWS
#### (Target Class Against Target and NBTY)

210.    This Count I is brought by Kaitlyn Pirtle, Linda Lee Boss, Justin Allsup, Jennifer Chamberlin, Martin Angiulli, and Joel Cohn, on behalf of themselves and the members of the Target Class against Defendants Target and NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Target Class.

211.    Plaintiffs and the members of the Target Class are individuals that paid for purchases of the Affected Target Products for personal, family, or household purposes.

212.    Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the promotion, distribution and sale of the Affected Target Products.

213.    Defendants violated this duty by misrepresenting the characteristics, ingredients, quantities, qualities, and intended purposes of the Affected Target Products, including but not limited to by: (i) representing that the Affected Target Products contained certain herbal supplements when they did not; and (ii) omitting to disclose that the Affected Target Products also contained contaminants and/or fillers.

214.    Plaintiffs and members of the Target Class were directly and proximately injured by Defendants' conduct and would not have paid for the Affected Target Products had Defendants not engaged in their deceptive conduct.

215.    Defendants' deceptive representations and material omissions to were, and are unfair and deceptive acts and practices.

- 61 -

216.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiffs and the proposed Class members.

217.    As a proximate result of Defendants' misrepresentations and omissions, Plaintiffs and the proposed Class members have suffered an ascertainable loss and are entitled to relief, in an amount to be determined at trial.

218.    Defendants' actions, as complained of herein, constitute unfair compensation or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of various state consumer protection statutes listed below.

219.    Specifically, Plaintiffs allege and the Target Class seeks redress under the following statutes against Target and NBTY:

  a.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. § 45.50.471, *et seq.*;

  b.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, *et seq.*;

  c.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE § 48-88-101, *et seq.*, including § 4-88-113(f), and § 4-88-102(5);

  d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE § 17200, and CAL. CIV. CODE § 1770, *et seq.*;

  e.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of COLO. REV. STAT. § 6-1-105, *et seq.*, including § 6-1-113(1)(c) and § 6-1-102(b);

  f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*, including § 42-110(a)(3);

  g.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 DEL. CODE § 2511, *et seq.*, including 6 DEL. CODE § 2512;

- 62 -

h.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE § 28-3901, *et seq.*, including § 28-390(1);

i.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. § 501.201, *et seq.*;

j.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*, including § 48-602;

k.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of INDIANA CODE ANN. § 24-5-0.5-3;

l.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 501/1, *et seq.*;

m.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE § 714H.1, *et seq.*;

n.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. ANN. Tit. § 59205-A;

o.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CONN. LAW CODE § 13-101, *et seq.*, including § 13-101(h);

p.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Ch. 93A § 1, *et seq.*;

q.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. STAT. § 445.901, *et seq.*, including § 445-902(c);

r.     Defendants have engaged in false advertising, unlawful trade practices, deceptive trade practices and consumer fraud in violation of MINN. STAT. §§ 325F.67, 325D.13, 325D.44, subd. 1(5), (7) and (13), and 325F.69, subd. 1;

s.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's MO. REV. STAT. § 407.010, *et seq.*;

t.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, *et seq.*, including § 59-1601(1);

u.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. § 598.0903, *et seq.*;

v.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. § 358-A:1, *et seq.*, including § 358A:1(1);

w.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. STAT. ANN. § 57:8-1, *et seq.*, including § 56:8-1(d);

x.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, *et seq.*;

y.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, *et seq.*;

z.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, *et seq.*;

aa.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*, including § 51-15-01(4);

bb.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OKLA. STAT. Tit. 15 § 751, *et seq.*;

cc.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*, including § 646.605(4);

dd.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. STAT. § 201-1, *et seq.*, including § 201-2(2);

ee.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE LAWS § 39-5-10, *et seq.*, including § 39-5-10(9);

ff.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODE LAWS § 37-24-1, *et seq.*, including § 37-24-1(8);

gg.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WEST VA. CODE § 46A-6-101, *et seq.*;

hh.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, *et seq.*;

- 64 -

    ii.    Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, *et seq.*, including § 19.86.010(1); and

    jj.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, *et seq.*

220.    Plaintiffs and members of the Target Class were injured by Defendants' conduct because Plaintiff and members of the Class would not have paid for the Affected Target Products, absent Defendants' conduct. Plaintiff and Class members are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices and to the relief set forth below.

221.    Plaintiffs have provided notice to the Attorney General where required by state statute and have sent pre-suit demand letters where appropriate.

## COUNT II

### VIOLATION OF STATE CONSUMER PROTECTION LAWS
### (Walgreens Class Against Walgreens and NBTY)

222.    This Count II is brought by Varonica Beal, Donald J. Weeks, Justin Allsup, Melissa Harris, William Patrick Mobley, Nilsa Cintron, Martin Angiulli, Carolyn Stevens and Russell Marks, on behalf of themselves and the members of the Walgreens Class against Defendants Walgreens and NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Walgreens Class.

223.    Plaintiffs and the members of the Walgreens Class are individuals that paid for purchases of the Affected Walgreens Products for personal, family, or household purposes.

224.    Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the promotion, distribution and sale of the Affected Walgreens Products.

- 65 -

225.     Defendants violated this duty by misrepresenting the characteristics, ingredients, quantities, and qualities  of the Affected Walgreens Products, including but not limited to by: (i) representing that the Affected Walgreens Products contained certain herbal supplements when they did not; and (ii) omitting to disclose that the Affected Walgreens Products also contained contaminants and/or fillers.

226.     Plaintiffs and members of the Walgreens Class were directly and proximately injured by Defendants' conduct and would not have paid for the Affected Walgreens Products had Defendants not engaged in their deceptive conduct.

227.     Defendants' deceptive representations and material omissions were, and are unfair and deceptive acts and practices.

228.     Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiffs and the proposed Class members.

229.     As a proximate result of Defendants' misrepresentations and omissions, Plaintiffs and the proposed Class members have suffered an ascertainable loss and are entitled to relief, in an amount to be determined at trial.

230.     Defendants' actions, as complained of herein, constitute unfair compensation or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of various state consumer protection statutes listed below.

231.     Specifically, Plaintiffs allege and the Walgreens Class seeks redress under the following statutes against Walgreens and NBTY:

a.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. § 45.50.471, *et seq.*;

b.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, *et seq.*;

c.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE § 48-88-101, *et seq.*, including § 4-88-113(f), and § 4-88-102(5);

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE § 17200, and CAL. CIV. CODE § 1770, *et seq.*;

e.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of COLO. REV. STAT. § 6-1-105, *et seq.*, including § 6-1-113(1)(c) and § 6-1-102(b);

f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*, including § 42-110(a)(3);

g.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 DEL. CODE § 2511, *et seq.*, including 6 DEL. CODE § 2512;

h.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE § 28-3901, *et seq.*, including § 28-390(1);

i.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. § 501.201, *et seq.*;

j.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*, including § 48-602;

k.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of INDIANA CODE ANN. § 24-5-0.5-3;

l.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 501/1, *et seq.*;

m.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE § 714H.1, *et seq.*;

n.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. ANN. Tit. § 59205-A;

o.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CONN. LAW CODE § 13-101, *et seq.*, including § 13-101(h);

- 67 -

p.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Ch. 93A § 1, *et seq.*;

q.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. STAT. § 445.901, *et seq.*, including § 445-902(c);

r.      Defendants have engaged in false advertising, unlawful trade practices, deceptive trade practices and consumer fraud in violation of MINN. STAT. §§ 325F.67, 325D.13, 325D.44, subd. 1(5), (7) and (13), and 325F.69, subd. 1.;

s.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's MO. REV. STAT. § 407.010, *et seq.*;

t.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, *et seq.*, including § 59-1601(1);

u.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. § 598.0903, *et seq.*;

v.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. § 358-A:1, *et seq.*, including § 358A:1(1);

w.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. STAT. ANN. § 57:8-1, *et seq.*, including § 56:8-1(d);

x.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, *et seq.*;

y.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, *et seq.*;

z.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, *et seq.*;

aa.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*, including § 51-15-01(4);

bb.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OKLA. STAT. Tit. 15 § 751, *et seq.*;

- 68 -

cc. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*, including § 646.605(4);

dd. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. STAT. § 201-1, *et seq.*, including § 201-2(2);

ee. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE LAWS § 39-5-10, *et seq.*, including § 39-5-10(9);

ff. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODE LAWS § 37-24-1, *et seq.*, including § 37-24-1(8);

gg. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WEST VA. CODE § 46A-6-101, *et seq.*;

hh. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, *et seq.*;

ii. Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, *et seq.*, including § 19.86.010(1); and

jj. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, *et seq.*

232. Plaintiffs and members of the Walgreens Class were injured by Defendants' conduct because Plaintiff and members of the Class would not have paid for the Affected Walgreens Products, absent Defendants' conduct. Plaintiff and Class members are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices and to the relief set forth below.

233. Plaintiffs have provided notice to the Attorney General where required by state statute and have sent pre-suit demand letters where appropriate.

- 69 -

## COUNT III

### VIOLATION OF STATE CONSUMER PROTECTION LAWS
### (Walmart Class Against Walmart and NBTY)

234. This Count III is brought by Plaintiffs Kaitlyn Pirtle, Victoria Shahrashian, John Burns, Louise L. Williams, Charles J. Haje, Melissa Harris, Dale Kardasz, Martin Angiulli, Carolyn Stevens and Elizabeth Anne Stokes, on behalf of themselves and the members of the Walmart Class against Defendants Walmart and NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Walmart Class.

235. Plaintiffs and the members of the Walmart Class are individuals that paid for purchases of the Affected Walmart Products for personal, family, or household purposes.

236. Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the promotion, distribution, and sale of the Affected Walmart Products.

237. Defendants violated this duty by misrepresenting the characteristics, ingredients, quantities, and qualities of the Affected Walmart Products, including but not limited to by: (i) representing that the Affected Walmart Products contained certain herbal supplements when they did not; and (ii) omitting to disclose that the Affected Walmart Products also contained contaminants and/or fillers.

238. Plaintiffs and members of the Walmart Class were directly and proximately injured by Defendants' conduct and would not have paid for the Affected Walmart Products had Defendants not engaged in their deceptive conduct.

239. Defendants' deceptive representations and material omissions were, and are unfair and deceptive acts and practices.

240.     Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiffs and the proposed Class members.

241.     As a proximate result of Defendants' misrepresentations and omissions, Plaintiffs and the proposed Class members have suffered an ascertainable loss and are entitled to relief, in an amount to be determined at trial.

242.     Defendants' actions, as complained of herein, constitute unfair compensation or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of various state consumer protection statutes listed below.

243.     Specifically, Plaintiffs allege and the Walmart Class seeks redress under the following statutes against Walmart and NBTY:

    a.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. § 45.50.471, *et seq.*;

    b.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, *et seq.*;

    c.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE § 48-88-101, *et seq.*, including § 4-88-113(f), and § 4-88-102(5);

    d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE § 17200, and CAL. CIV. CODE § 1770, *et seq.*;

    e.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of COLO. REV. STAT. § 6-1-105, *et seq.*, including § 6-1-113(1)(c) and § 6-1-102(b);

    f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*, including § 42-110(a)(3);

    g.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 DEL. CODE 2511, *et seq.*, including 6 DEL. CODE § 2512;

- 71 -

h.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE § 28-3901, *et seq.*, including § 28-390(1);

i.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. § 501.201, *et seq.*;

j.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*, including § 48-602;

k.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of INDIANA CODE ANN. § 24-5-0.5-3;

l.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 501/1, *et seq.*;

m.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE § 714H.1, *et seq.*;

n.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. ANN. Tit. § 59205-A;

o.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CONN. LAW CODE § 13-101, *et seq.*, including § 13-101(h);

p.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Ch. 93A § 1, *et seq.*;

q.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. STAT. § 445.901, *et seq.*, including § 445-902(c);

r.  Defendants have engaged in false advertising, unlawful trade practices, deceptive trade practices and consumer fraud in violation of MINN. STAT. §§ 325F.67, 325D.13, 325D.44, subd. 1(5), (7) and (13), and 325F.69, subd. 1.;

s.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's MO. REV. STAT. § 407.010, *et seq.*;

t.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, *et seq.*, including § 59-1601(1);

u.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. § 598.0903, *et seq.*;

- 72 -

v.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. § 358-A:1, *et seq.*, including § 358A:1(1);

w.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. STAT. ANN. § 57:8-1, *et seq.*, including § 56:8-1(d);

x.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, *et seq.*;

y.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, *et seq.*;

z.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, *et seq.*;

aa.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*, including § 51-15-01(4);

bb.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OKLA. STAT. Tit. 15 § 751, *et seq.*;

cc.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*, including § 646.605(4);

dd.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. STAT. § 201-1, *et seq.*, including § 201-2(2);

ee.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE LAWS § 39-5-10, *et seq.*, including § 39-5-10(9);

ff.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODE LAWS § 37-24-1, *et seq.*, including § 37-24-1(8);

gg.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WEST VA. CODE § 46A-6-101, *et seq.*;

hh.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, *et seq.*;

ii.    Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, *et seq.*, including § 19.86.010(1); and

jj.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, *et seq.*

244.    Plaintiffs and members of the Walmart Class were injured by Defendants' conduct because Plaintiff and members of the Class would not have paid for the Affected Walmart Products, absent Defendants' conduct. Plaintiff and Class members are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices and to the relief set forth below.

245.    Plaintiffs have provided notice to the Attorney General where required by state statute and have sent pre-suit demand letters where appropriate.

## COUNT IV

## BREACH OF EXPRESS WARRANTIES
### (Target Class Against Target)

246.    This Count IV is brought by Kaitlyn Pirtle, Linda Lee Boss, Justin Allsup, Jennifer Chamberlin, Martin Angiulli, and Joel Cohn, on behalf of themselves and the members of the Target Class against Defendants Target and NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Target Class.

247.    Defendant Target is in the business of labeling and selling the Affected Target Products to consumers such as Plaintiffs and the members of the Target Class.

248.    Plaintiffs and the members of the Target Class purchased one or more of the Affected Target Products.

- 74 -

249. Defendant Target expressly warranted that the Affected Target Products contained the primary ingredient and did not contain undisclosed contaminants or other fillers.

250. Defendant Target's express warranty became a part of the basis of the bargain in the transactions featuring sales of Affected Target Products to Plaintiffs and Class members.

251. The Affected Target Products do not conform to these express representations because they do not contain the primary ingredient and/or contain undisclosed contaminants or other fillers. Thus, Defendant breached its express warranties.

252. As a direct and proximate result of the breach of said warranties, Plaintiffs and the Target Class members suffered and/or will continue to be harmed and suffer economic loss.

253. Plaintiffs and the Target Class members relied on the express warranties of Defendant Target herein.

254. Defendant's conduct breached their express warranties in violation of, among other state express warranty laws:

     a. ALA. CODE. § 7-2-313;

     b. AK. ST. § 42.02.313;

     c. ARIZ. REV. STAT. ANN. § 47-2313;

     d. ARK. CODE ANN. § 4-2-313;

     e. CAL. COMM. CODE § 2313;

     f. COLO. REV. STAT. § 4-2-313;

     g. CONN. GEN. STAT. ANN. § 42A-2-313;

     h. 6 DEL. C. § 2-313;

     i. D.C. STAT. § 28:2-313;

     j. FLA. STAT. § 672.313;

     k. GA. CODE. ANN. § 11-2-313;

- 75 -

l.      HAW. REV. STAT. § 490:2-313;

m.     IDAHO CODE ANN. § 28-2-313;

n.      810 ILL. COMP. STAT. 5/2-313;

o.      IND. CODE § 26-1-2-313;

p.      IOWA CODE § 554.2313;

q.      KANSAS STAT. ANN. § 84-2-313;

r.      KY. REV. STAT. ANN. § 355.2-313;

s.      LA. CIV. CODE. ANN. ART. 2520;

t.      ME. REV. STAT. ANN. § 2-313;

u.      MD. COM. LAW CODE ANN. § 2-313;

v.      MASS. GEN. LAWS ANN. 106 § 2-313;

w.     MICH. COMP. LAWS ANN. § 440.2313;

x.      MINN. STAT. ANN. § 336.2-313;

y.      MISS. CODE ANN. § 75-2-313;

z.      MISSOURI REV. STAT. § 400.2-313;

aa.    MONT. CODE. ANN. § 30-2-313;

bb.    NEB. REV. STAT. § 2-313;

cc.    NEV. REV. STAT. § 104.2313;

dd.    N.H. REV. STAT. § 382-A:2-313;

ee.    N.J. STAT. ANN. § 12A:2-313;

ff.     N.M. STAT. ANN. § 55-2-313;

gg.    N.Y. U.C.C. LAW § 2-313;

hh.    N.C. GEN. STAT. ANN. § 25-2-313;

ii.     N.D. STAT. § 41-02-30;

jj.     OHIO REV. CODE ANN. § 1302.26;

kk.     OKLA. STAT. ANN. TIT. 12A, § 2-313;

ll.     OR. REV. STAT. § 72.3130;

mm.     PA. STAT. ANN. TIT. 13, § 2313;

nn.     R.I. STAT. § 6A-2-313;

oo.     S.C. § 36-2-313;

pp.     S.D. COD. LAWS § 57A-2-313;

qq.     TENN. CODE. ANN. § 47-2-313;

rr.     TEX. BUS. & COM. CODE ANN. § 2.313;

ss.     UT. CODE ANN. § 70A-2-313;

tt.     VT. STAT. ANN. § 2-313;

uu.     VA. CODE ANN. § 8.2-313;

vv.     WA. ANN. § 62A.2-313;

ww.     W. VA. CODE § 46-2-313;

xx.     WIS. STAT. § 402.313; and

yy.     WYO. STAT. § 34.1-2313.

255.     Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of themselves and members of the Target Class, placed Defendant Target on notice thereof.

256.     As a direct and proximate result of the foregoing acts and/or omissions, Plaintiffs and the Class members have suffered damages entitling them to compensatory damages, equitable and declaratory relief, costs and reasonable attorneys' fees.

## COUNT V

### BREACH OF EXPRESS WARRANTIES
### (Walgreens Class Against Walgreens)

257.     This Count V is brought by Varonica Beal, Donald J. Weeks, Justin Allsup, Melissa Harris, William Patrick Mobley, Nilsa Cintron, Martin Angiulli, Carolyn Stevens and Russell Marks, on behalf of themselves and the members of the Walgreens Class against Defendants Walgreens. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Walgreens Class.

258.     Defendant Walgreens is in the business of labeling and selling the Affected Walgreens Products to consumers such as Plaintiffs and the members of the Walgreens Class.

259.     Plaintiffs and the members of the Walgreens Class purchased one or more of the Affected Walgreens Products.

260.     Defendant Walgreens expressly warranted that the Affected Walgreens Products contained the primary ingredient and did not contain undisclosed contaminants or other fillers.

261.     Defendant Walgreens' express warranty became a part of the basis of the bargain in the transactions featuring sales of Affected Walgreens Products to Plaintiffs and Class members.

262.     The Affected Walgreens Products do not conform to these express representations because they do not contain the primary ingredient and/or contain undisclosed contaminants or other fillers. Thus, Defendant breached its express warranties.

263.     As a direct and proximate result of the breach of said warranties, Plaintiffs and the Walgreens Class members suffered and/or will continue to be harmed and suffer economic loss.

264.    Plaintiffs and the Walgreens Class members did rely on the express warranties of the Defendant herein.

265.    Defendant Walgreens' conduct breached its express warranties in violation of, among other state express warranty laws:

    a.    ALA. CODE. § 7-2-313;

    b.    AK. ST. § 42.02.313;

    c.    ARIZ. REV. STAT. ANN. § 47-2313;

    d.    ARK. CODE ANN. § 4-2-313;

    e.    CAL. COMM. CODE § 2313;

    f.    COLO. REV. STAT. § 4-2-313;

    g.    CONN. GEN. STAT. ANN. § 42A-2-313;

    h.    6 DEL. C. § 2-313;

    i.    D.C. STAT. § 28:2-313;

    j.    FLA. STAT. § 672.313;

    k.    GA. CODE. ANN. § 11-2-313;

    l.    HAW. REV. STAT. § 490:2-313;

    m.    IDAHO CODE ANN. § 28-2-313;

    n.    810 ILL. COMP. STAT. 5/2-313;

    o.    IND. CODE § 26-1-2-313;

    p.    IOWA CODE § 554.2313;

    q.    KANSAS STAT. ANN. § 84-2-313;

    r.    KY. REV. STAT. ANN. § 355.2-313;

    s.    LA. CIV. CODE. ANN. ART. 2520;

    t.    ME. REV. STAT. ANN. § 2-313;

    u.    MD. COM. LAW CODE ANN. § 2-313;

- 79 -

v. MASS. GEN. LAWS ANN. 106 § 2-313;

w. MICH. COMP. LAWS ANN. § 440.2313;

x. MINN. STAT. ANN. § 336.2-313;

y. MISS. CODE ANN. § 75-2-313;

z. MISSOURI REV. STAT. § 400.2-313;

aa. MONT. CODE. ANN. § 30-2-313;

bb. NEB. REV. STAT. § 2-313;

cc. NEV. REV. STAT. § 104.2313;

dd. N.H. REV. STAT. § 382-A:2-313;

ee. N.J. STAT. ANN. § 12A:2-313;

ff. N.M. STAT. ANN. § 55-2-313;

gg. N.Y. U.C.C. LAW § 2-313;

hh. N.C. GEN. STAT. ANN. § 25-2-313;

ii. N.D. STAT. § 41-02-30;

jj. OHIO REV. CODE ANN. § 1302.26;

kk. OKLA. STAT. ANN. TIT. 12A, § 2-313;

ll. OR. REV. STAT. § 72.3130;

mm. PA. STAT. ANN. TIT. 13, § 2313;

nn. R.I. STAT. § 6A-2-313;

oo. S.C. § 36-2-313;

pp. S.D. COD. LAWS § 57A-2-313;

qq. TENN. CODE. ANN. § 47-2-313;

rr. TEX. BUS. & COM. CODE ANN. §2.313;

ss. UT. CODE ANN. § 70A-2-313;

tt. VT. STAT. ANN. § 2-313;

- 80 -

      uu.      VA. CODE ANN. § 8.2-313;

      vv.      WA. ANN. § 62A.2-313;

      ww.      W. VA. CODE § 46-2-313;

      xx.      XX.      WIS. STAT. § 402.313; AND

      yy.      WYO. STAT. § 34.1-2313.

266. Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of themselves and members of the Walgreens Class, placed Defendant Target on notice thereof.

267. As a direct and proximate result of the foregoing acts and/or omissions, Plaintiffs and the Class members have suffered damages entitling them to compensatory damages, equitable and declaratory relief, costs and reasonable attorneys' fees.

## COUNT VI

### BREACH OF EXPRESS WARRANTIES
### (Walmart Class Against Walmart)

268. This Count VI is brought by Plaintiffs Kaitlyn Pirtle, Victoria Shahrashian, John Burns, Louise L. Williams, Charles J. Haje, Melissa Harris, Dale Kardasz, Brenda Viera, Martin Angiulli, Carolyn Stevens and Elizabeth Anne Stokes, on behalf of themselves and the members of the Walmart Class against Defendants Walmart and NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Walmart Class.

269. Defendant Walmart is in the business of labeling and selling the Affected Walmart Products to consumers such as Plaintiffs and the members of the Walmart Class.

270. Plaintiffs and the members of the Walmart Class purchased one or more of the Affected Walmart Products.

271.     Defendant expressly warranted that the Affected Walmart Products contained the primary ingredient and did not contain undisclosed contaminants or other fillers.

272.     Defendant Walmart's express warranty became a part of the basis of the bargain in the transactions featuring sales of Affected Walmart Products to Plaintiffs and Class members.

273.     The Affected Walmart Products do not conform to these express representations because they do not contain the primary ingredient and/or contain undisclosed contaminants or other fillers. Thus, Defendant breached its express warranties.

274.     As a direct and proximate result of the breach of said warranties, Plaintiffs and the Walmart Class members suffered and/or will continue to be harmed and suffer economic loss.

275.     Plaintiffs and the Walmart Class members did rely on the express warranties of the Defendant herein.

276.     Defendant's conduct breached their express warranties in violation of, among other state express warranty laws:

      a.      ALA. CODE. § 7-2-313;

      b.      AK. ST. § 42.02.313;

      c.      ARIZ. REV. STAT. ANN. § 47-2313;

      d.      ARK. CODE ANN. § 4-2-313;

      e.      CAL. COMM. CODE § 2313;

      f.      COLO. REV. STAT. § 4-2-313;

      g.      CONN. GEN. STAT. ANN. § 42A-2-313;

      h.      6 DEL. C. § 2-313;

      i.      D.C. STAT. § 28:2-313;

      j.      FLA. STAT. § 672.313;

      k.      GA. CODE. ANN. § 11-2-313;

- 82 -

l.      HAW. REV. STAT. § 490:2-313;

m.     IDAHO CODE ANN. § 28-2-313;

n.      810 ILL. COMP. STAT. 5/2-313;

o.      IND. CODE § 26-1-2-313;

p.      IOWA CODE § 554.2313;

q.      KANSAS STAT. ANN. § 84-2-313;

r.      KY. REV. STAT. ANN. § 355.2-313;

s.      LA. CIV. CODE. ANN. ART. 2520;

t.      ME. REV. STAT. ANN. § 2-313;

u.      MD. COM. LAW CODE ANN. § 2-313;

v.      MASS. GEN. LAWS ANN. 106 § 2-313;

w.     MICH. COMP. LAWS ANN. § 440.2313;

x.      MINN. STAT. ANN. § 336.2-313;

y.      MISS. CODE ANN. § 75-2-313;

z.      MISSOURI REV. STAT. § 400.2-313;

aa.    MONT. CODE. ANN. § 30-2-313;

bb.    NEB. REV. STAT. § 2-313;

cc.    NEV. REV. STAT. § 104.2313;

dd.    N.H. REV. STAT. § 382-A:2-313;

ee.    N.J. STAT. ANN. § 12A:2-313;

ff.    N.M. STAT. ANN. § 55-2-313;

gg.    N.Y. U.C.C. LAW § 2-313;

hh.    N.C. GEN. STAT. ANN. § 25-2-313;

ii.     N.D. STAT. § 41-02-30;

jj.     OHIO REV. CODE ANN. § 1302.26;

- 83 -

kk.     OKLA. STAT. ANN. TIT. 12A, § 2-313;

ll.     OR. REV. STAT. § 72.3130;

mm.     PA. STAT. ANN. TIT. 13, § 2313;

nn.     R.I. STAT. § 6A-2-313;

oo.     S.C. § 36-2-313;

pp.     S.D. COD. LAWS § 57A-2-313;

qq.     TENN. CODE. ANN. § 47-2-313;

rr.     TEX. BUS. & COM. CODE ANN. §2.313;

ss.     UT. CODE ANN. § 70A-2-313;

tt.     VT. STAT. ANN. § 2-313;

uu.     VA. CODE ANN. § 8.2-313;

vv.     WA. ANN. § 62A.2-313;

ww.     W. VA. CODE § 46-2-313;

xx.     WIS. STAT. § 402.313; AND

yy.     WYO. STAT. § 34.1-2313.

277.    Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of themselves and members of the Walmart Class, placed Defendant on notice thereof.

278.    As a direct and proximate result of the foregoing acts and/or omissions, Plaintiff and the Class members have suffered damages entitling them to compensatory damages, equitable and declaratory relief, costs and reasonable attorneys' fees.

## COUNT VII

## BREACH OF IMPLIED WARRANTIES
### (Target Class Against Target)

279.    This Count VII is brought by Kaitlyn Pirtle, Linda Lee Boss, Justin Allsup, Jennifer Chamberlin, Martin Angiulli, and Joel Cohn, on behalf of themselves and the members of the Target Class against Defendant Target. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Target Class.

280.    Defendant Target is in the business of selling the Affected Target Products to consumers such as Plaintiffs and the members of the Target Class.

281.    A warranty that the Affected Target Products are merchantable was thus implied in all contracts for their sale, including in the sale of the products to Plaintiffs and the members of the Target Class, each of whom purchased one or more Affected Target Products.

282.    Defendant breached its warranty of merchantability with respect to its sale of the Affected Target Products to Plaintiffs and Class members.

283.    Defendant breached its warranty of merchantability with respect to its sale of the Affected Target Products to Plaintiffs and Class members.

284.    The Affected Target Products were not merchantable at the time of sale because they did not contain the advertised primary herbal supplement ingredient and/or contained undisclosed contaminants and fillers, and thus (a) would not pass without objection in the trade under the contract description; (b) are not of fair average quality within the description provided; (c) are not fit for the ordinary purposes for which such goods are sold; (d) are not adequately contained, packaged, or labeled as the sales agreement required; and (e) did not conform to the promises or affirmations of fact made on the container or label.

- 85 -

285. As a direct and proximate result of the breach of implied warranties, Plaintiffs and the Class members suffered and/or will continue to be harmed and suffer economic loss, including, without limitation, the money they spent on the unmerchantable Affected Target Products.

286. Defendant's conduct breached its implied warranties regarding its products under state implied warranty laws including:

      a.      ALA. CODE. § 7-2-314 and § 7-2-315;

      b.      ARIZ. REV. STAT. ANN. § 47-2314 and § 47-2315;

      c.      ARK. STAT. § 7-2-314 and § 7-2-315;

      d.      AK. ST. § 45.02.314 and § 45.02.315;

      e.      CAL. COMM. CODE § 2314 and § 2315;

      f.      CO. REV. STAT. § 4-2-314 and § 4-2-315;

      g.      CONN. GEN. STAT. § 41a-2-314 and § 41a-2-315;

      h.      6 DEL. C. § 2-314 and § 2-315;

      i.      D.C. STAT. § 28:2-314 and § 28:2-315;

      j.      FLA. STAT. § 672.314 and § 672.315;

      k.      GA. CODE. ANN. § 11-2-314 and § 11-2-315;

      l.      HAW. REV. STAT. § 490:2-314 and § 490:2-315;

      m.      IDAHO CODE ANN. § 28-2-314 and § 28-2-315;

      n.      810 ILL. COMP. STAT 5/2-314 and 5/2-315;

      o.      IND. CODE § 26-1-2-314 and § 26-1-2-315;

      p.      IOWA CODE § 554.2314 and § 554.2315;

      q.      KAN. STAT. ANN. § 84-2-314 and § 84-2-315;

      r.      KY. REV. STAT. ANN. § 355.2-314 and § 355.2-315;

      s.      La. Civ. Code Ann. Art. 2524;

t.      ME. REV. STAT. ANN. § 2-314 and § 2-315;

u.      MD. COM. LAW CODE ANN. § 2-314 and § 2-315;

v.      MASS. GEN. LAWS ANN. 106 § 2-314 and § 2-315;

w.      MICH. COMP. LAWS ANN. § 440.2314 and § 440.2315;

x.      MINN. STAT. ANN. § 336.2-314 and §336.2-315;

y.      MISS. CODE ANN. § 75-2-314 and § 75-2-315;

z.      MO. REV. STAT. § 400.2-314 and § 400.2-315;

aa.      MONT. CODE ANN. § 30-2-314 and § 30-2-315;

bb.      NEB. REV. STAT. § 2-314 and § 2-315;

cc.      NEV. REV. STAT. § 104.2314 and § 104.2315;

dd.      N.H. STAT. ANN. § 382-A:2-314 and § 382-A:2-315;

ee.      N.J. STAT. ANN. § 12A:2-314 and § 12A:2-315;

ff.      N.M. STAT. ANN. § 55-2-314 and § 55-2-315;

gg.      N.Y. U.C.C. § 2-314 and § 2-315;

hh.      N.C. GEN. STAT. § 25-2-314 and § 25-2-315;

ii.      N.D. STAT. § 41-02-31 and § 41-02-32;

jj.      OHIO REV. CODE ANN. § 1302.27 and § 1302.28;

kk.      OKLA. STAT. ANN. TIT. 12A, § 2-314 and § 2-315;

ll.      O.R.S. § 72.8020 and § 72.8030;

mm.      PA. STAT. ANN. TIT. 13, § 2314 and §2315;

nn.      R.I. GEN. LAWS § 6A-2-314 and § 6A-2-315;

oo.      S.C. § 36-2-314 and § 36-2-315;

pp.      S.D. COD. LAWS. § 57A-2-314 and § 57A-2-315;

qq.      TENN. CODE. ANN. § 47-2-314 and § 47-2-315;

rr.      Tex. Bus. & Com. Code Ann. § 2.314 and § 2.315;

ss.    UT. CODE ANN. § 70A-2-314 and § 70A-2-315;

tt.    VT. STAT. ANN. TIT. 9A, § 314 and § 315;

uu.    VA. CODE ANN. § 8.2-314 and § 8.2-315;

vv.    WASH. REV. CODE § 62A.2-314 and § 62A.2-315;

ww.    W. VA. CODE § 46-2-314 and § 46-2-315;

xx.    WIS. STAT. § 402.314 and § 402.314; and

yy.    WYO. STAT. § 34.1-2-314 and § 34.1-2-315.

287.    Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of himself and members of the Class, placed Defendant on notice thereof.

288.    As a direct and proximate result of the foregoing acts and/or omissions, Plaintiffs and the Class members have suffered damages, and are entitled to compensatory damages, costs and reasonable attorneys' fees.

## COUNT VIII

## BREACH OF IMPLIED WARRANTIES
### (Target Class Against NBTY)

289.    This Count VIII is brought by Kaitlyn Pirtle, Linda Lee Boss, Justin Allsup, Jennifer Chamberlin, Martin Angiulli, and Joel Cohn, on behalf of themselves and the members of the Target Class against Defendant NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Target Class.

290.    Defendant NBTY is in the business of manufacturing, supplying, and/or distributing the Affected Target Products to consumers such as Plaintiffs and the members of the Target Class.

- 88 -

291.    A warranty that the Affected Target Products are merchantable was thus implied in all contracts for their sale, including in the sale of the products to Plaintiffs and the members of the Target Class, each of whom purchased one or more Affected Target Products.

292.    Defendant breached its warranty of merchantability with respect to its manufacture, supply, and/or distribution of the Affected Target Products to Plaintiffs and Class members.

293.    The Affected Target Products were not merchantable at the time of manufacture, supply, distribution, and sale because they did not contain the advertised primary ingredient and/or contained undisclosed contaminants and fillers, and thus (a) would not pass without objection in the trade under the contract description; (b) are not of fair average quality within the description provided; (c) are not fit for the ordinary purposes for which such goods are sold; (d) are not adequately contained, packaged, or labeled as the sales agreement required; and (e) did not conform to the promises or affirmations of fact made on the container or label.

294.    As a direct and proximate result of the breach of implied warranties, Plaintiffs and the Class members suffered and/or will continue to be harmed and suffer economic loss, including, without limitation, the money they spent on the unmerchantable Affected Target Products.

295.    Defendant's conduct breached its implied warranties regarding its products under state implied warranty laws including:

        a.    ARK. STAT. § 7-2-314 and § 7-2-315;

        b.    AK. ST. § 45.02.314 and § 45.02.315;

        c.    CO. REV. STAT. § 4-2-314 and § 4-2-315;

        d.    CONN. GEN. STAT. § 41a-2-314 and § 41a-2-315;

        e.    6 DEL. C. § 2-314 and § 2-315;

f.        D.C. STAT. § 28:2-314 and § 28:2-315;

g.        HAW. REV. STAT. § 490:2-314 and § 490:2-315;

h.        KAN. STAT. ANN. § 84-2-314 and § 84-2-315;

i.        La. Civ. Code Ann. Art. 2524;

j.        ME. REV. STAT. ANN. § 2-314 and § 2-315;

k.        MD. COM. LAW CODE ANN. § 2-314 and § 2-315;

l.        MASS. GEN. LAWS ANN. 106 § 2-314 and § 2-315;

m.        MINN. STAT. ANN. § 336.2-314 and §336.2-315;

n.        MISS. CODE ANN. § 75-2-314 and § 75-2-315;

o.        MO. REV. STAT. § 400.2-314 and § 400.2-315;

p.        MONT. CODE ANN. § 30-2-314 and § 30-2-315;

q.        NEB. REV. STAT. § 2-314 and § 2-315;

r.        NEV. REV. STAT. § 104.2314 and § 104.2315;

s.        N.H. STAT. ANN. § 382-A:2-314 and § 382-A:2-315;

t.        N.J. STAT. ANN. § 12A:2-314 and § 12A:2-315;

u.        N.M. STAT. ANN. § 55-2-314 and § 55-2-315;

v.        N.D. STAT. § 41-02-31 and § 41-02-32;

w.        OKLA. STAT. ANN. TIT. 12A, § 2-314 and § 2-315;

x.        O.R.S. § 72.8020 and § 72.8030;

y.        PA. STAT. ANN. TIT. 13, § 2314 and §2315;

z.        S.C. § 36-2-314 and § 36-2-315;

aa.        S.D. COD. LAWS. § 57A-2-314 and § 57A-2-315;

bb.        Tex. Bus. & Com. Code Ann. § 2.314 and § 2.315;

cc.        W. VA. CODE § 46-2-314 and § 46-2-315; and

dd.        WYO. STAT. § 34.1-2-314 and § 34.1-2-315.

296.    Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of himself and members of the Class, placed Defendant on notice thereof.

297.    Plaintiffs and the Class members are entitled to compensatory damages, costs and reasonable attorneys' fees.

**COUNT IX**

**BREACH OF IMPLIED WARRANTIES**
**(Walgreens Class Against Walgreens)**

298.    This Count IX is brought by Varonica Beal, Donald J. Weeks, Justin Allsup, Melissa Harris, William Patrick Mobley, Nilsa Cintron, Martin Angiulli, Carolyn Stevens and Russell Marks, on behalf of themselves and the members of the Walgreens Class against Defendant Walgreens. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Walgreens Class.

299.    Defendant Walgreens is in the business of selling the Affected Walgreens Products to consumers such as Plaintiffs and the members of the Walgreens Class.

300.    A warranty that the Affected Walgreens Products are merchantable was thus implied in all contracts for their sale, including in the sale of the products to Plaintiffs and the members of the Walgreens Class, each of whom purchased one or more Affected Walgreens Products.

301.    Defendant breached its warranty of merchantability with respect to its sale of the Affected Walgreens Products to Plaintiffs and Class members.

302.    The Affected Target Products were not merchantable at the time of sale because they did not contain the advertised primary herbal supplement ingredient and/or contained undisclosed contaminants and fillers, and thus (a) would not pass without objection in the trade

- 91 -

under the contract description; (b) are not of fair average quality within the description provided; (c) are not fit for the ordinary purposes for which such goods are sold; (d) are not adequately contained, packaged, or labeled as the sales agreement required; and (e) did not conform to the promises or affirmations of fact made on the container or label.

303. As a direct and proximate result of the breach of implied warranties, Plaintiffs and the Class members suffered and/or will continue to be harmed and suffer economic loss, including, without limitation, the money they spent on the unmerchantable Affected Walgreens Products.

304. Defendant's conduct breached its implied warranties regarding its products under state implied warranty laws including:

a. ALA. CODE. § 7-2-314 and § 7-2-315;

b. ARIZ. REV. STAT. ANN. § 47-2314 and § 47-2315;

c. ARK. STAT. § 7-2-314 and § 7-2-315;

d. AK. ST. § 45.02.314 and § 45.02.315;

e. CAL. COMM. CODE § 2314 and § 2315;

f. CO. REV. STAT. § 4-2-314 and § 4-2-315;

g. CONN. GEN. STAT. § 41a-2-314 and § 41a-2-315;

h. 6 DEL. C. § 2-314 and § 2-315;

i. D.C. STAT. § 28:2-314 and § 28:2-315;

j. FLA. STAT. § 672.314 and § 672.315;

k. GA. CODE. ANN. § 11-2-314 and § 11-2-315;

l. HAW. REV. STAT. § 490:2-314 and § 490:2-315;

m. IDAHO CODE ANN. § 28-2-314 and § 28-2-315;

n. 810 ILL. COMP. STAT 5/2-314 and 5/2-315;

- 92 -

o. IND. CODE § 26-1-2-314 and § 26-1-2-315;

p. IOWA CODE § 554.2314 and § 554.2315;

q. KAN. STAT. ANN. § 84-2-314 and § 84-2-315;

r. KY. REV. STAT. ANN. § 355.2-314 and § 355.2-315;

s. La. Civ. Code Ann. Art. 2524;

t. ME. REV. STAT. ANN. § 2-314 and § 2-315;

u. MD. COM. LAW CODE ANN. § 2-314 and § 2-315;

v. MASS. GEN. LAWS ANN. 106 § 2-314 and § 2-315;

w. MICH. COMP. LAWS ANN. § 440.2314 and § 440.2315;

x. MINN. STAT. ANN. § 336.2-314 and §336.2-315;

y. MISS. CODE ANN. § 75-2-314 and § 75-2-315;

z. MO. REV. STAT. § 400.2-314 and § 400.2-315;

aa. MONT. CODE ANN. § 30-2-314 and § 30-2-315;

bb. NEB. REV. STAT. § 2-314 and § 2-315;

cc. NEV. REV. STAT. § 104.2314 and § 104.2315;

dd. N.H. STAT. ANN. § 382-A:2-314 and § 382-A:2-315;

ee. N.J. STAT. ANN. § 12A:2-314 and § 12A:2-315;

ff. N.M. STAT. ANN. § 55-2-314 and § 55-2-315;

gg. N.Y. U.C.C. § 2-314 and § 2-315;

hh. N.C. GEN. STAT. § 25-2-314 and § 25-2-315;

ii. N.D. STAT. § 41-02-31 and § 41-02-32;

jj. OHIO REV. CODE ANN. § 1302.27 and § 1302.28;

kk. OKLA. STAT. ANN. TIT. 12A, § 2-314 and § 2-315;

ll. O.R.S. § 72.8020 and § 72.8030;

mm. PA. STAT. ANN. TIT. 13, § 2314 and §2315;

- 93 -

nn.  R.I. GEN. LAWS § 6A-2-314 and § 6A-2-315;

oo.  S.C. § 36-2-314 and § 36-2-315;

pp.  S.D. COD. LAWS. § 57A-2-314 and § 57A-2-315;

qq.  TENN. CODE. ANN. § 47-2-314 and § 47-2-315;

rr.  Tex. Bus. & Com. Code Ann. § 2.314 and § 2.315;

ss.  UT. CODE ANN. § 70A-2-314 and § 70A-2-315;

tt.  VT. STAT. ANN. TIT. 9A, § 314 and § 315;

uu.  VA. CODE ANN. § 8.2-314 and § 8.2-315;

vv.  WASH. REV. CODE § 62A.2-314 and § 62A.2-315;

ww.  W. VA. CODE § 46-2-314 and § 46-2-315;

xx.  WIS. STAT. § 402.314 and § 402.314; and

yy.  WYO. STAT. § 34.1-2-314 and § 34.1-2-315.

305.  Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of himself and members of the Class, placed Defendant on notice thereof.

306.  Plaintiffs and the Class members are entitled to compensatory damages, costs and reasonable attorneys' fees.

## COUNT X

## BREACH OF IMPLIED WARRANTIES
### (Walgreens Class Against NBTY)

307.  This Count X is brought by Varonica Beal, Donald J. Weeks, Justin Allsup, Melissa Harris, William Patrick Mobley, Nilsa Cintron, Martin Angiulli, Carolyn Stevens and Russell Marks, on behalf of themselves and the members of the Walgreens Class against Defendant NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Walgreens Class.

- 94 -

308.     Defendant NBTY is in the business of selling the Affected Walgreens Products to consumers such as Plaintiffs and the members of the Walgreens Class.

309.     A warranty that the Affected Target Products are merchantable was thus implied in all contracts for their sale, including in the sale of the products to Plaintiffs and the members of the Walgreens Class, each of whom purchased one or more Affected Walgreens Products.

310.     Defendant breached its warranty of merchantability with respect to its manufacture, supply, and/or distribution of the Affected Walgreens Products to Plaintiffs and Class members.

311.     The Affected Walgreens Products were not merchantable at the time of manufacture, supply, distribution, and sale because they did not contain the advertised primary herbal supplement ingredient and/or contained undisclosed contaminants and fillers, and thus (a) would not pass without objection in the trade under the contract description; (b) are not of fair average quality within the description provided; (c) are not fit for the ordinary purposes for which such goods are sold; (d) are not adequately contained, packaged, or labeled as the sales agreement required; and (e) did not conform to the promises or affirmations of fact made on the container or label.

312.     As a direct and proximate result of the breach of implied warranties, Plaintiffs and the Class members suffered and/or will continue to be harmed and suffer economic loss, including, without limitation, the money they spent on the unmerchantable Affected Walgreens Products.

313.     Defendant's conduct breached its implied warranties regarding its products under state implied warranty laws including:

      a.      ARK. STAT. § 7-2-314 and § 7-2-315;

      b.      AK. ST. § 45.02.314 and § 45.02.315;

- 95 -

c.      Co. Rev. Stat. § 4-2-314 and § 4-2-315;

d.      Conn. Gen. Stat. § 41a-2-314 and § 41a-2-315;

e.      6 Del. C. § 2-314 and § 2-315;

f.      D.C. Stat. § 28:2-314 and § 28:2-315;

g.      Haw. Rev. Stat. § 490:2-314 and § 490:2-315;

h.      Kan. Stat. Ann. § 84-2-314 and § 84-2-315;

i.      La. Civ. Code Ann. Art. 2524;

j.      Me. Rev. Stat. Ann. § 2-314 and § 2-315;

k.      Md. Com. Law Code Ann. § 2-314 and § 2-315;

l.      Mass. Gen. Laws Ann. 106 § 2-314 and § 2-315;

m.      Minn. Stat. Ann. § 336.2-314 and §336.2-315;

n.      Miss. Code Ann. § 75-2-314 and § 75-2-315;

o.      Mo. Rev. Stat. § 400.2-314 and § 400.2-315;

p.      Mont. Code Ann. § 30-2-314 and § 30-2-315;

q.      Neb. Rev. Stat. § 2-314 and § 2-315;

r.      Nev. Rev. Stat. § 104.2314 and § 104.2315;

s.      N.H. Stat. Ann. § 382-A:2-314 and § 382-A:2-315;

t.      N.J. Stat. Ann. § 12A:2-314 and § 12A:2-315;

u.      N.M. Stat. Ann. § 55-2-314 and § 55-2-315;

v.      N.D. Stat. § 41-02-31 and § 41-02-32;

w.      Okla. Stat. Ann. tit. 12A, § 2-314 and § 2-315;

x.      O.R.S. § 72.8020 and § 72.8030;

y.      Pa. Stat. Ann. tit. 13, § 2314 and §2315;

z.      S.C. § 36-2-314 and § 36-2-315;

aa.      S.D. Cod. Laws. § 57A-2-314 and § 57A-2-315;

      bb.    Tex. Bus. & Com. Code Ann. § 2.314 and § 2.315;

      cc.    W. VA. CODE § 46-2-314 and § 46-2-315; and

      dd.    WYO. STAT. § 34.1-2-314 and § 34.1-2-315.

314.    Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of himself and members of the Class, placed Defendant on notice thereof.

315.    Plaintiffs and the Class members are entitled to compensatory damages, costs and reasonable attorneys' fees.

## COUNT XI

## BREACH OF IMPLIED WARRANTIES
### (Walmart Class Against Walmart)

316.    This Count XI is brought by Plaintiffs Kaitlyn Pirtle, Victoria Shahrashian, John Burns, Louise L. Williams, Charles J. Haje, Melissa Harris, Dale Kardasz, Brenda Viera, Martin Angiulli, Carolyn Stevens and Elizabeth Anne Stokes, on behalf of themselves and the members of the Walmart Class against Defendant Walmart. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Walmart Class.

317.    Defendant Walmart is in the business of selling the Affected Walmart Products to consumers such as Plaintiffs and the members of the Walmart Class.

318.    A warranty that the Affected Walmart Products are merchantable was thus implied in all contracts for their sale, including in the sale of the products to Plaintiffs and the members of the Walmart Class, each of whom purchased one or more Affected Walmart Products.

319.    Defendant breached its warranty of merchantability with respect to its sale of the Affected Walmart Products to Plaintiffs and Class members.

320.    The Affected Walmart Products were not merchantable at the time of sale because they did not contain the advertised primary herbal ingredient and/or contained undisclosed contaminants and fillers, and thus (a) would not pass without objection in the trade under the contract description; (b) are not of fair average quality within the description provided; (c) are not fit for the ordinary purposes for which such goods are sold; (d) are not adequately contained, packaged, or labeled as the sales agreement required; and (e) did not conform to the promises or affirmations of fact made on the container or label.

321.    As a direct and proximate result of the breach of implied warranties, Plaintiffs and the Class members suffered and/or will continue to be harmed and suffer economic loss, including, without limitation, the money they spent on the unmerchantable Affected Walmart Products.

322.    Defendant's conduct breached its implied warranties regarding its products under state implied warranty laws including:

   a.  ALA. CODE. § 7-2-314 and § 7-2-315;

   b.  ARIZ. REV. STAT. ANN. § 47-2314 and § 47-2315;

   c.  ARK. STAT. § 7-2-314 and § 7-2-315;

   d.  AK. ST. § 45.02.314 and § 45.02.315;

   e.  CAL. COMM. CODE § 2314 and § 2315;

   f.  CO. REV. STAT. § 4-2-314 and § 4-2-315;

   g.  CONN. GEN. STAT. § 41a-2-314 and § 41a-2-315;

   h.  6 DEL. C. § 2-314 and § 2-315;

   i.  D.C. STAT. § 28:2-314 and § 28:2-315;

   j.  FLA. STAT. § 672.314 and § 672.315;

   k.  GA. CODE. ANN. § 11-2-314 and § 11-2-315;

l.      HAW. REV. STAT. § 490:2-314 and § 490:2-315;

m.      IDAHO CODE ANN. § 28-2-314 and § 28-2-315;

n.      810 ILL. COMP. STAT 5/2-314 and 5/2-315;

o.      IND. CODE § 26-1-2-314 and § 26-1-2-315;

p.      IOWA CODE § 554.2314 and § 554.2315;

q.      KAN. STAT. ANN. § 84-2-314 and § 84-2-315;

r.      KY. REV. STAT. ANN. § 355.2-314 and § 355.2-315;

s.      La. Civ. Code Ann. Art. 2524;

t.      ME. REV. STAT. ANN. § 2-314 and § 2-315;

u.      MD. COM. LAW CODE ANN. § 2-314 and § 2-315;

v.      MASS. GEN. LAWS ANN. 106 § 2-314 and § 2-315;

w.      MICH. COMP. LAWS ANN. § 440.2314 and § 440.2315;

x.      MINN. STAT. ANN. § 336.2-314 and §336.2-315;

y.      MISS. CODE ANN. § 75-2-314 and § 75-2-315;

z.      MO. REV. STAT. § 400.2-314 and § 400.2-315;

aa.     MONT. CODE ANN. § 30-2-314 and § 30-2-315;

bb.     NEB. REV. STAT. § 2-314 and § 2-315;

cc.     NEV. REV. STAT. § 104.2314 and § 104.2315;

dd.     N.H. STAT. ANN. § 382-A:2-314 and § 382-A:2-315;

ee.     N.J. STAT. ANN. § 12A:2-314 and § 12A:2-315;

ff.     N.M. STAT. ANN. § 55-2-314 and § 55-2-315;

gg.     N.Y. U.C.C. § 2-314 and § 2-315;

hh.     N.C. GEN. STAT. § 25-2-314 and § 25-2-315;

ii.     N.D. STAT. § 41-02-31 and § 41-02-32;

jj.     OHIO REV. CODE ANN. § 1302.27 and § 1302.28;

- 99 -

kk.     OKLA. STAT. ANN. TIT. 12A, § 2-314 and § 2-315;

ll.     O.R.S. § 72.8020 and § 72.8030;

mm.     PA. STAT. ANN. TIT. 13, § 2314 and §2315;

nn.     R.I. GEN. LAWS § 6A-2-314 and § 6A-2-315;

oo.     S.C. § 36-2-314 and § 36-2-315;

pp.     S.D. COD. LAWS. § 57A-2-314 and § 57A-2-315;

qq.     TENN. CODE. ANN. § 47-2-314 and § 47-2-315;

rr.     Tex. Bus. & Com. Code Ann. § 2.314 and § 2.315;

ss.     UT. CODE ANN. § 70A-2-314 and § 70A-2-315;

tt.     VT. STAT. ANN. TIT. 9A, § 314 and § 315;

uu.     VA. CODE ANN. § 8.2-314 and § 8.2-315;

vv.     WASH. REV. CODE § 62A.2-314 and § 62A.2-315;

ww.     W. VA. CODE § 46-2-314 and § 46-2-315;

xx.     WIS. STAT. § 402.314 and § 402.314; and

yy.     WYO. STAT. § 34.1-2-314 and § 34.1-2-315.

323.    Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of himself and members of the Class, placed Defendant on notice thereof.

324.    Plaintiffs and the Class members are entitled to compensatory damages, costs and reasonable attorneys' fees.

## COUNT XII

### BREACH OF IMPLIED WARRANTIES
### (Walmart Class Against NBTY)

325.    This Count XII is brought by Plaintiffs Kaitlyn Pirtle, Victoria Shahrashian, John Burns, Louise L. Williams, Charles J. Haje, Melissa Harris, Dale Kardasz, Martin Angiulli, Carolyn Stevens and Elizabeth Anne Stokes, on behalf of themselves and the members of the

- 100 -

Walmart Class against Defendant NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Walmart Class.

326.   Defendant NBTY is in the business of manufacturing, supplying, distributing and/or selling the Affected Walmart Products to consumers such as Plaintiffs and the members of the Walmart Class.

327.   A warranty that the Affected Walmart Products are merchantable was thus implied in all contracts for their sale, including in the sale of the products to Plaintiffs and the members of the Walmart Class, each of whom purchased one or more Affected Walmart Products.

328.   Defendant breached its warranty of merchantability with respect to its manufacture, supply, distribution and/or sale of the Affected Walmart Products to Plaintiffs and Class members.

329.   The Affected Walmart Products were not merchantable at the time of manufacture, supply, distribution, and sale because they did not contain the advertised primary herbal supplement ingredient and/or contained undisclosed contaminants and fillers, and thus (a) would not pass without objection in the trade under the contract description; (b) are not of fair average quality within the description provided; (c) are not fit for the ordinary purposes for which such goods are sold; (d) are not adequately contained, packaged, or labeled as the sales agreement required; and (e) did not conform to the promises or affirmations of fact made on the container or label.

330.   As a direct and proximate result of the breach of implied warranties, Plaintiffs and the Class members suffered and/or will continue to be harmed and suffer economic loss,

including, without limitation, the money they spent on the unmerchantable Affected Walgreens Products.

331.    Defendant's conduct breached its implied warranties regarding its products under state implied warranty laws including:

      a.      ARK. STAT. § 7-2-314 and § 7-2-315;

      b.      AK. ST. § 45.02.314 and § 45.02.315;

      c.      CO. REV. STAT. § 4-2-314 and § 4-2-315;

      d.      CONN. GEN. STAT. § 41a-2-314 and § 41a-2-315;

      e.      6 DEL. C. § 2-314 and § 2-315;

      f.      D.C. STAT. § 28:2-314 and § 28:2-315;

      g.      HAW. REV. STAT. § 490:2-314 and § 490:2-315;

      h.      KAN. STAT. ANN. § 84-2-314 and § 84-2-315;

      i.      LA. CIV. CODE ANN. ART. 2524;

      j.      ME. REV. STAT. ANN. § 2-314 and § 2-315;

      k.      MD. COM. LAW CODE ANN. § 2-314 and § 2-315;

      l.      MASS. GEN. LAWS ANN. 106 § 2-314 and § 2-315;

      m.      MINN. STAT. ANN. § 336.2-314 and §336.2-315;

      n.      MISS. CODE ANN. § 75-2-314 and § 75-2-315;

      o.      MO. REV. STAT. § 400.2-314 and § 400.2-315;

      p.      MONT. CODE ANN. § 30-2-314 and § 30-2-315;

      q.      NEB. REV. STAT. § 2-314 and § 2-315;

      r.      NEV. REV. STAT. § 104.2314 and § 104.2315;

      s.      N.H. STAT. ANN. § 382-A:2-314 and § 382-A:2-315;

      t.      N.J. STAT. ANN. § 12A:2-314 and § 12A:2-315;

      u.      N.M. STAT. ANN. § 55-2-314 and § 55-2-315;

v.     N.D. STAT. § 41-02-31 and § 41-02-32;

w.     OKLA. STAT. ANN. TIT. 12A, § 2-314 and § 2-315;

x.     O.R.S. § 72.8020 and § 72.8030;

y.     PA. STAT. ANN. TIT. 13, § 2314 and §2315;

z.     S.C. § 36-2-314 and § 36-2-315;

aa.     S.D. COD. LAWS. § 57A-2-314 and § 57A-2-315;

bb.     Tex. Bus. & Com. Code Ann. § 2.314 and § 2.315;

cc.     W. VA. CODE § 46-2-314 and § 46-2-315; and

dd.     WYO. STAT. § 34.1-2-314 and § 34.1-2-315.

332.    Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of himself and members of the Class, placed Defendant on notice thereof.

333.    Plaintiffs and the Class members are entitled to compensatory damages, costs and reasonable attorneys' fees.

## COUNT XIII

### UNJUST ENRICHMENT
### (Target Class Against Target and NBTY)

334.    This Count XIII is brought by Kaitlyn Pirtle, Linda Lee Boss, Justin Allsup, Jennifer Chamberlin, Martin Angiulli, and Joel Cohn, on behalf of themselves and the members of the Target Class against Defendants Target and NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Target Class.

335.    Defendants have unjustly retained a benefit to the detriment of Plaintiffs and members of the Target Class. The Defendants manufactured, distributed, supplied, and/or sold the Affected Target Products to Plaintiffs and the Class, which did not contain the represented herbal ingredients. In addition, the Affected Target Products contained numerous other

- 103 -

ingredients that were not disclosed. The Defendants continue to possess money paid by Plaintiffs and the Class to which they are not entitled.

336.    The Defendants' retention of the benefit violates the fundamental principles of justice, equity and good conscience. The Defendants did not disclose that many of the Affected Target Products did not contain the represented herbal ingredients or contained other materials not disclosed on the packaging.

337.    As a direct and proximate result of the Defendants' misrepresentations and/or omissions with respect to the content of the Affected Target Products, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

**COUNT XIV**

**UNJUST ENRICHMENT**
**(Walgreens Class Against Walgreens and NBTY)**

338.    This Count XIV is brought by Varonica Beal, Donald J. Weeks, Justin Allsup, Melissa Harris, William Patrick Mobley, Nilsa Cintron, Martin Angiulli, Carolyn Stevens and Russell Marks, on behalf of themselves and the members of the Walgreens Class against Defendants Walgreens and NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Walgreens Class.

339.    Defendants have unjustly retained a benefit to the detriment of Plaintiffs and members of the Walgreens Class. The Defendants manufactured, distributed, supplied, and/or sold the Affected Walgreens Products, which failed to contain the represented herbal ingredients. In addition, the Affected Walgreens Products contained numerous other ingredients that were not disclosed. The Defendants continue to possess money paid by Plaintiffs and the Class to which they are not entitled.

- 104 -

340.    The Defendants' retention of the benefit violates the fundamental principles of justice, equity and good conscience. The Defendants did not disclose that many of the Affected Walgreens Products failed to contain the represented herbal ingredients or contained other materials not disclosed.

341.    As a direct and proximate result of the Defendants' misrepresentations and/or omissions with respect to the content of the Affected Walgreens Products, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

### COUNT XV

### UNJUST ENRICHMENT
### (Walmart Class Against Walmart and NBTY)

342.    This Count XV is brought by Plaintiffs Kaitlyn Pirtle, Victoria Shahrashian, John Burns, Louise L. Williams, Charles J. Haje, Melissa Harris, Dale Kardasz, Martin Angiulli, Carolyn Stevens and Elizabeth Anne Stokes, on behalf of themselves and the members of the Walmart Class against Defendants Walmart and NBTY. The factual allegations of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Walmart Class.

343.    Defendants have unjustly retained a benefit to the detriment of Plaintiffs and members of the Walmart Class. The Defendants manufactured, distributed, supplied, and/or sold the Affected Walmart Products to Plaintiffs and the Class, which do not contain the represented herbal ingredients. In addition, the Affected Walmart Products contained numerous other ingredients that were not disclosed. The Defendants continue to possess money paid by Plaintiffs and the Class to which they are not entitled.

344.    The Defendants' retention of the benefit violates the fundamental principles of justice, equity and good conscience. The Defendants did not disclose that many of the Affected

- 105 -

Walmart Products failed to contain the represented herbal ingredients or contained other materials not disclosed on the packaging of the herbal supplements.

345. As a direct and proximate result of the Defendants' misrepresentations and/or omissions with respect to the content of the Affected Walmart Products, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the respective Class members request that the Court enter an order or judgment against the Defendants including the following:

A. Declaring that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure, Rule 23, and for an order certifying this case as a class action and appointing Plaintiffs' counsel to represent the Class as reflected above;

B. Declaring that the Defendants' practice of manufacturing, distributing, supplying, advertising, and selling Affected Products that fail to contain the represented herbal supplement ingredients was wrongful and unfair;

C. Restitution for all purchases of Affected Products by Plaintiffs and the Class, in an amount to be determined at trial;

D. Disgorgement of the ill-gotten gains derived by the Defendants from their misconduct;

E. Actual damages in an amount according to proof;

F. Punitive damages;

G. Compensatory damages caused by the Defendants' unfair or deceptive practices; along with exemplary damages to Plaintiffs and each Class member for each violation;

- 106 -

H. A permanent injunction requiring the Defendants to cease selling Affected Products that fail to contain the advertised ingredients or fail to disclose ingredients not listed on the Affected Products' labeling;

I. Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

J. An order awarding Plaintiffs and the Class their attorney's fees and costs and expenses incurred in connection with this action; and

M. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: November 11, 2015  Respectfully submitted,

      By: */s/ Steve W. Berman*
        Steve W. Berman
      HAGENS BERMAN SOBOL SHAPIRO LLP
      1918 Eighth Avenue, Suite 3300
      Seattle, Washington 98101
      Telephone: (206) 623-7292
      Facsimile: (206) 623-0594
      E-mail: steve@hbsslaw.com

      Elizabeth A. Fegan
      Jason A. Zweig
      Thomas E. Ahlering
      HAGENS BERMAN SOBOL SHAPIRO LLP
      455 N. Cityfront Plaza Drive, Suite 2410
      Chicago, IL 60611
      Telephone: (708) 628-4949
      Facsimile: (708) 628-4950
      E-mail: beth@hbsslaw.com
        jasonz@hbsslaw.com
        toma@hbsslaw.com

By: */w/ Robert A. Clifford*
Robert A. Clifford, Esq.
Shannon McNulty
Kristofer S. Riddle
CLIFFORD LAW OFFICES, P.C.
Clifford Law Offices, P.C.
120 N. LaSalle Street, 31st Floor
Chicago, IL 60602
Telephone: (312) 899-9090
Email: RAC@cliffordlaw.com
          SMM@cliffordlaw.com

*Co-Chairs of the Lead Counsel Committee*

Tal J. Lifshitz
Monica Marie McNulty
Adam M. Moskowitz
Robert J. Neary
KOZYAK TROPIN & THROCKMORTON LLP
2525 Ponce De Leon Boulevard , 9th Floor
Coral Gables, FL 33134
Telephone:  305-728-2959
E-mail:tjl@kttlaw.com
          mmcnulty@kttlaw.com
          amm@kttlaw.com
          rn@kttlaw.com

Joseph P. Guglielmo
SCOTT + SCOTT, ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Ave, 40th Fl.
New York, NY 10174
Telephone:  212-223-6444
E-mail:  jguglielmo@scott-scott.com

Erin Green Comite
SCOTT + SCOTT, ATTORNEYS AT LAW, LLP
PO Box 192
156 South Main Street
Colchester, CT 06415
Telephone:  860-537-5537
E-mail:ecomite@scott-scott.com

- 108 -

Andrei V. Rado
MILBERG LLP
One Pennsylvania Plaza, 50th Floor
New York, NY 10119
(212) 946-9315
E-mail:arado@milberg.com

Daniel C. Girard
David Stein
Elizabeth Kramer
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  415-981-4800
E-mail:dcg@girardgibbs.com
      ds@girardgibbs.com
      eak@girardgibbs.com

Vincent J. Esades
Renae Diane Steiner
David Woodward
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403-3218
Telephone:  612-338-4605
E-mail:vesades@heinsmills.com
      rsteiner@heinsmills.com
      dwoodward@heinsmills.com

*Lead Counsel Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 11, 2015, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered attorneys.

*/s/ Steve W. Berman*

010494-12  828506 V1